MOORE v. IVEY et al.    (No. 690—4243.)

(Commission of Appeals of Texas, Section A. Nov. 18, 1925.)

**1. Appeal and error ⊜⟞978(3)—New trial ⊜⟞ 56—New trial granted, where reasonably doubtful whether improper conduct of jury affected verdict; appellate court required to reverse, where trial court abused discretion in denying new trial for misconduct of jury.**

If, upon a consideration of the whole of the pertinent record, it is reasonably doubtful whether improper conduct of jury affected amount of verdict or decision of any other material issue, verdict should be set aside by trial judge; and, if a new trial is not granted, there is an abuse of discretion by trial judge, and reversal becomes duty of appellate court.

**2. New trial ⊜⟞56—Doubt as to effect of misconduct of jury resolved against verdict.**

When misconduct of jury is once shown, and there is a reasonable doubt as to its effect, that doubt must be resolved against verdict.

**3. New trial ⊜⟞56—Verdict must be set aside if juror is influenced at all on a material issue.**

Verdict must be set aside if, upon a material issue, a juror be influenced at all by misconduct, and extent is immaterial.

**4. New trial ⊜⟞144—Absence of actual effect of jurors' misconduct not established by their denials.**

The absence of actual effect of misconduct of jury cannot be established by most emphatic denials made by jurors when they are called to account.

**5. Appeal and error ⊜⟞929—Reviewing tribunal required to treat improper conduct of jury as transpiring during deliberations of jury prior to verdict.**

Where there was at least substantially reasonable doubt that improper conduct of jurors happened after verdict was agreed on, reviewing tribunal was required to treat occurrence as transpiring during deliberations of jury prior to verdict reached.

**6. New trial ⊜⟞144—Self-serving declarations of jurors that they were not influenced by discussion of extraneous matter prior to verdict are not conclusive.**

Self-serving declarations of jurors, hearing discussion on extraneous matter prior to verdict, that they were not influenced thereby, but that they were governed by charge of court and evidence, are not conclusive.

**7. Trial ⊜⟞306—Judgment reversed for misconduct of jury.**

Talk of jurors as to amount of recovery in other cases and as to attorneys' fees, and that defendant doctor was threatened by suit by another, and probability of insurance, *held* such misconduct as to call for a reversal, in view of Rev. St. 1911, art. 2021.

Error to Court of Civil Appeals of First Supreme Judicial District.

Suit by Ruby Carter Ivey, joined pro forma by her husband, against John T. Moore. Judgment for plaintiffs was affirmed in the Court of Civil Appeals (264 S. W. 283), and defendant brings error. Reversed and remanded.

Andrews, Streetman, Logue & Mobley, of Houston, for plaintiff in error.

Woods, King & John, of Houston, for defendants in error.

Statement of the Case.

NICKELS, J. Mrs. Ivey (et vir) sued Dr. Moore for alleged malpractice in, and in connection with, an operation. The negligence averred and recovered upon was that Dr. Moore had improperly left a piece of gauze (called a "sponge") in the incision. The damages were laid at $25,000, and the jury awarded $8,750.

In the trial court and in the Court of Civil Appeals (264 S. W. 283) Dr. Moore questioned the sufficiency of the evidence to present an issue of negligence, and supported his position with substantial reason. The trial court declined a peremptory instruction in his favor, and this action was affirmed by the Court of Civil Appeals, with the statement that—

---

⊜⟞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"The finding of the jury that the sponge was left in Mrs. Ivey in the Moore operation is not so against the weight and preponderance of the evidence as to require us to set the same aside."

Whether this ruling was correct or not is not important, because that matter is either foreclosed, or it is immaterial, in view of the nature and disposition of the assignments of error upon which the writ was granted. Those assignments present misconduct of the jury, and we have called attention to the others in illustration of the possibility and probability of injury sequent of the alleged misconduct. In other words, the case is one where any misconduct may easily have contributed to cause the verdict.

On September 3, 1924, defendants in error filed their motion to dismiss the petition for writ of error for want of jurisdiction, because, it was claimed, the assignments embraced solely questions of fact upon which there is final jurisdiction in the Court of Civil Appeals. The motion was overruled by the Supreme Court November 12, 1924.

### Opinion.

The acts of misconduct charged are these: (1) One juror (Clark) had knowledge of, and in the jury room discussed, the facts and results of another and somewhat similar malpractice case; (2) another juror had in mind and discussed the probability that Dr. Moore had insurance protecting him against loss; (3) the probability that Mrs. Ivey's attorneys would get a portion of the amount recovered, etc., was mentioned and considered; (4) the fact that another doctor had been threatened with suit in an appendicitis operation case and the basis of that proposed suit was discussed; (5) suggestion was made that a verdict against Dr. Moore might tend to make doctors more careful. Dr. Moore avers that the misconduct affected the verdict in whole or at least to the extent of an excessive award.

The opinion of the Court of Civil Appeals indicates the belief of these judges that each and all of the matters were referred to and discussed in the jury room, but for reasons there stated the assignments of misconduct were overruled.

[1, 2] The determinative rules, or principles, of law are plain and well established. If, upon a consideration of the whole of the pertinent record, it is reasonably doubtful whether or not the improper conduct affected the amount of the verdict or the decision of any other material issue, the verdict should be set aside by the trial judge; if, in such a case, a new trial is not granted, there is an abuse of discretion by the trial judge, and reversal becomes the duty of appellate courts. H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606; Southern Traction Co. v. Wilson (Tex. Com. App.) 254 S. W. 1104; Hines v.

Parry (Tex. Com. App.) 238 S. W. 886. It may be clear that eleven (or a lesser number) of the jurors were not, to any degree, influenced by the improper conduct; yet if it remains reasonably doubtful whether one (or a larger number) was, or was not, influenced, the vice remains and the verdict must be set aside (Southern Traction Co. v. Wilson, supra) because each juror can rightly agree to the verdict only when guided solely by the instructions of the trial judge and the evidence heard in open court. A proper corollary is that, when misconduct is once shown, and there is reasonable doubt as to its effect, that doubt must be resolved against the verdict. Faithful adherence to these principles is essential to the due and orderly administration of the law; infidelity here makes justice doubtful and invites corruption at its source. To the extent that verdicts may be affected or controlled by external or extraneous influence projected into jury rooms, due process of law is mocked, even though its forms be meticulously observed, and government is subverted through the most dangerous and insidious of processes. It results that in every case of alleged misconduct there is an interest which transcends even that of the parties litigant, and which renders apparent hardship immaterial; it becomes the duty of the courts, for the protection of the state and its public, as well as for the purpose of justice in the particular case, to see to it that jury verdicts remain pure through the striking down of those whose integrity is doubtful.

[3] For the application and enforcement of these principles there are other rules whose justice cannot be doubted. If upon a material issue a juror be influenced at all, the extent (or rather the impossibility of measuring with exactitude the extent) is immaterial; this because definite portions of an opinion or idea cannot be allocated to each of its various confederate causes. See Southern Traction Co. v. Wilson, supra.

[4] Again, the absence of actual effect cannot be established (conclusively, at least) by the most emphatic denials made by jurors when they are called to account. Hines v. Parry (Tex. Com. App.) 238 S. W. 886; San Antonio Traction Co. v. Cassanova (Tex. Civ App.) 154 S. W. 1190; J. H. W. Steele Co. v. Dover (Tex. Civ. App.) 170 S. W. 809. When it is remembered, as it must be, that every case of misconduct includes violation of the juror's oath, a species of perjury, and liability to punishment for contempt, it is but natural to expect that the juror, when called into open court to answer about what happened in the jury room and its secrecy, will be earnest in his efforts to excuse and mitigate the offense, but laggard in advancing its actual proportions. It is known by us all, furthermore, that none of us can definitely appropriate to any one thing its exact effect when an act has been done, or an opinion formed, under circumstances where some other thing

may have contributed (subconsciously, perhaps) a portion to the result; hence, it becomes the duty of the court to look over and beyond the juror's protestation that he was influenced only by the "law and evidence."

With these principles and rules in mind, a study of the record has impelled us to disagreement with the trial court and the Court of Civil Appeals in respect to the issues of misconduct. Because of this, and because of the delicate but extremely important nature of the questions involved, we are led to a more extended and detailed analysis of the record here than might otherwise suffice.

To Dr. Moore's motion for new trial were attached affidavits executed by Jurors Goldberg and Wappler. Therein Goldberg and Wappler each stated that after the retirement of the jury, and before a verdict was reached, some one of the jurors "mentioned the case of Daniel v. Dr. Ellis, and stated that in said case a verdict of $15,000 was returned by the jury, and that said case was similar to the one we had under consideration"; Wappler adding that "it was stated that Dr. Ellis had left a gauze in the patient he was treating, causing damages for which she sued." Each of them stated also that, prior to the agreement upon the verdict some juror "mentioned the fact that Dr. Moore probably had insurance and would not suffer any loss on account of any damages assessed against him;" "that one or more of the jurors discussed the probability that plaintiff's attorneys had taken the case on a contingent basis, and that they would probably get as much as 50 per cent. of any amount she recovered;" "that one or more of the jurors stated, in substance and effect, that he had information about a case in which a doctor had performed an operation in which he removed an appendix, and in which it was claimed by the mother of the girl upon whom the operation was performed that the appendix was not infected and should not have been removed, but that the doctor had stated to her, even after the operation, that it was infected, and that he (the juror making said statement) had some difficulty in preventing this woman from suing the doctor;" and that "one or more of the members of the jury" stated "that the verdict if reached against Dr. Moore, would be a lesson to the doctors, causing them to be more careful in the future." Each affidavit concludes with the declaration, "I endeavored to reach a verdict according to the law and the evidence."

Pursuant to the terms of article 2021, R. S. 1911, ten of the jurors testified in relation to some or all of these matters. The substance of the testimony will be related presently, and the meaning of some of it will be clearer if it is borne in mind that throughout its deliberations the jury was "confined" in a "small room," where it was easily possible for each member to witness everything done and to hear everything said, especially if he was faithful and duly attentive to the grave duties imposed upon him.

Goldberg was duly selected foreman of the jury, and presided as such during the early deliberations. The case had been submitted (as to negligence) upon the sole (special) issue of whether or not Dr. Moore used and failed to remove a sponge or gauze before closing the incision. Upon this issue the jury took a ballot which disclosed the fact that Goldberg believed Dr. Moore to be free of negligence, and the other eleven jurors thought he had been negligent. That Goldberg's contention of lack of negligence rested upon substantial ground, and that he was not then merely capricious, is manifested by the review of the evidence contained in the opinion of the Court of Civil Appeals. A finding of negligence depended largely upon belief in the truth of Mrs. Ivey's testimony, and that Goldberg then believed her narrative to be at least unreasonable is made obvious by the fact that in the beginning of the deliberations he declared he "would bet within 60 days she would be in Niagara Falls," etc. Up to, and through, the first ballot, then, Goldberg firmly disbelieved the existence of negligence, and his disbelief had amply justifying support in the evidence. Subsequently, however, his opinion changed, and he finally agreed to a finding of negligence. Moreover, Goldberg at first thought that $4,000 "would be a plenty" of damages to award, even if negligence existed. Later he agreed to a verdict awarding $8,750. This description of Goldberg's original attitude, as well as subsequent statements of the progress of his change, does not depend wholly upon his own testimony; it is clearly shown in the testimony of Juror Clark, who "took the lead" (in the jury room) "in trying to swing Mr. Goldberg over," and who (in his examination on the motion for new trial) manifested considerable interest in protecting the verdict. Clark and Goldberg, on essentials, are mutually corroborative, and each has substantial support from other jurors; in no important respect is either Goldberg or Clark directly contradicted by any other juror.

Apparently the jury received the case during the afternoon. What took place between that time and "about 15 minutes after 11" o'clock is thus described in a general way by Clark:

"After the first ballot, which was a secret ballot, the jury stood eleven to one in the affirmative on the first question. We didn't reach an agreement until after supper, still discussing the first question, and after we passed the first question up—we passed it up due to the fact that Mr. Goldberg, who happened to be foreman and also happened to be the one holding out, I guess that is the term to use—and he being foreman it was decided to appoint an assistant foreman. I was elected to that position and for that reason I, in a way, took the initiative or the lead in trying to swing Mr Goldberg over. We passed up the first ques-

(277 S.W.)

tion at the request of one or two of the members, and I said: 'Gentlemen, it may be that Mr. Goldberg possibly might change his opinion if the amount isn't too much.' That was mentioned by me myself, and we did pass up the first question and the remaining two questions was read and discussed but passed over to get this last question. In other words, we had not answered the affirmative questions until about 15 minutes after 11, and finally Mr. Goldberg said he thought $4,000 would be a plenty; he said possibly he might change his opinion (he didn't openly say so), so then we started to bringing up the amount, discussing the amount. All the ballots taken were written ballots, secret ballots so to speak, pieces of paper. Questions were answered either 'Yes' or 'No' and folded, and taken up and recorded by Mr. Roy Dean—we appointed him as secretary to record all ballots—and we found that some of the men stood for $5,000, some for $12,500. During the argument some of the jury figured that by dividing the amount into half it would be fair to both sides, that was mentioned, but I don't remember who done that. My figure was $12,750, as well as I remember, due to the fact that this halfway figure had impressed me as being fair to Dr. Moore and also fair to Mrs. Ivey, and I added to the half $250 that she had spent since the operation. I didn't consider that expenses of the operation but the different expenses. That is why I voted for that. We then took how many men were over $10,000 and how many were under, and by division the average was brought down, and I think there was still three of us, including myself, that didn't think we ought to accept, or rather ought to agree, to a verdict of less than $10,000, and it came to where, figuring on the basis of Mr. Goldberg and one or two others that had been at $5,000, figuring on the basis of how much they had agreed to increase, and what those that were over ought to decrease to meet the figure, got it down to ninety-two hundred and some odd dollars—I think the figure was $9,271. Then three stood for that and the others were willing to settle for $8,250, and the final agreement reached $8,750."

The result of the first ballot (taken, apparently, during the afternoon) having disclosed that Goldberg "was holding out" on the primal question of negligence, and this, in turn, having led to his deposition as foreman and the elevation of Clark to "assistant" (rather, "substitute") foremanship, settlement of that issue was pretermitted upon the theory and plan that "Mr. Goldberg possibly might change his opinion if the amount isn't too much." According to Clark, Goldberg was "swung over" on "negligence" about "15 minutes after 11" o'clock, and *then* they "started" "discussing the amount" and took ballots on "amount" which showed that "some of the men stood for $5,000, some for $12,500; Goldberg saying, at first, that he thought $4,000 "would be a plenty," but indicating he might change his opinion. If Clark's testimony (above and next referred to) be true, all of the acts of alleged misconduct, in points of time and circumstance, so happened as to make it possible and probable that their influence, whatever it was, contributed to cause Goldberg's change on the issue of negligence and on the issue of amount, as well as the change from $5,000 to $8,750 made by some of the other jurors. This is so because Clark, at least at one time and place, definitely stated that a matter of "insurance" was mentioned, that Goldberg thereupon said "he didn't think the whole damn family had that much insurance," and that he "would bet within 60 days she" (i. e. Mrs. Ivey) "would be in Niagara Falls," and that this happened in the "jury room before we had made any figures, or before we had even taken up the first question" (i. e. the issue of negligence). He said, further, that, in connection with, or response to, Goldberg's declarations, he (Clark) "then" told him (Goldberg) about the "Dr. Ellis Case:"

Just what Clark "then" told Goldberg about the "Dr. Ellis Case" is best stated in his own words:

"I said I wasn't positive of the name of the doctor, and yet I wouldn't swear to my knowledge it was Dr. Ellis, although I believe it was, and I said I have a neighbor that had a small piece of bone and a piece of gauze left in her nose by a doctor in the city of Houston (and I didn't mention any names), and this woman has had repeated trouble and went to New Orleans and had had physical pain, and had been allowed $15,000 by a jury, and therefore we figured that $8,750 was a fair figure, considering the fact that this other woman got $15,000 for a piece being in the nose."

He added the statement that he "was really sincere in his belief on that basis." Here, then, is a plain and unequivocal declaration by Clark, who early "took the lead in trying to swing Mr. Goldberg over," that he (Clark) gave testimony in the jury room which, indubitably, would have led to a reversal if it had been allowed to be given in open court. That declaration is coupled with the even plainer one that, because of knowledge, by Clark and others, of the "Dr. Ellis Case," "therefore we figured that $8,750 was a fair figure, *considering* the fact that this other woman get $15,000 for a piece being in the nose." As to the effect of this guilty knowledge upon Clark and upon the unnamed jurors comprehended in the pronoun "we," there can be no doubt, if Clark is credited. He said they "considered the fact that this other woman get $15,000 for a piece being in the nose," and "therefore we figured that $8,750 was a fair figure."

This effect, already achieved in the minds of Clark and others, was *then* (early in the deliberation) attempted to be transmitted from Clark to Goldberg, as well as to the other jurors who originally believed $5,000 to be adequate damages, if they heard the discussion of the "Dr. Ellis Case." Goldberg subsequently changed position on each of the two important issues in the case and agreed to a verdict (both on negligence and amount)

which he strenuously opposed before Clark's declarations. The argument and force in Clark's statements, and their natural tendency and ability to work a change of opinion in Goldberg and the other jurors, are greatly added to when it is recalled that the piece of gauze which was averred to have been left in Mrs. Ivey's body was 32 to 34 inches in length and about 8 inches in width, whereas the piece left in the nose of the other woman was a "small" one.

It was argued in the Court of Civil Appeals, and it is argued here, that the declarations made by Clark were, in reality, made after agreement upon the verdict. If absolute certainty were required in a case of this character, there would be force in the argument, for, it must be admitted, the record includes confusion. But certainty is not required; the test is whether the record exhibits ground for reasonable doubt as to the purity of the verdict. The trial court and the Court of Civil Appeals made no finding of fact relating to the time of Clark's statements; because of this, and because of the manifest importance of that fact, we have searched the record most thoroughly in an effort to find and consider every statement and circumstance bearing upon it. As stated before, Clark, immediately in connection with the narrative quoted, definitely fixed the time of the discussion as having been in the very beginning of the deliberations. Before giving that testimony, he had testified that the matter was discussed "after the verdict was signed and sealed," but that he was not positive (and would not swear) that it was not discussed before the verdict was reached. Upon cross-examination by counsel for Mrs. Ivey he said that he "thought" the discussion was after the verdict had been "sealed," and "to the best of his knowledge" it was after the verdict had been "sealed." It is obvious, therefore, that, even if we discount the literalism of the testimony wherein he definitely fixed the time as before the verdict, and give full effect to all else he said upon the point, Clark himself suffered great doubt as to whether the statements were made before or after the agreement upon the verdict. When testifying, Clark must have been acutely conscious of the reprehensible nature of his conduct in the jury room. It is manifest also that he desired to protect the verdict: else there is no explanation of his obvious purpose to evade the truth. That he did intend and attempt evasion is demonstrated by the fact that he twice (at first) denied recollection as to who mentioned the "Dr. Ellis Case," whereas he mentioned it himself, and by the fact that he claimed he did not have "the Ellis Case in mind at all" in his consideration of the verdict, whereas, according to his own words, it was "therefore we figured that $8,750 was a fair figure *considering* the fact that this other woman got $15,000 for a piece being in the nose." In our opinion this conduct substantially discredits Clark's effort to place the discussion after the verdict. Goldberg, both in his affidavit and in his testimony, definitely fixed the time as being before the verdict was reached. Wappler likewise so stated in his affidavit. As to Wappler's testimony, the Court of Civil Appeals says he stated, on cross-examination, "that it was after the verdict had been agreed upon that such matters were mentioned," but in this that court is in error. What Wappler did say, on cross-examination, is this:

"I might say this, we first put down all our figures and each man's name before we discussed anything extraneous. We had put our figures down which we felt was correct, and naturally we wanted to stay with these figures.

"Q. What amount were you for? A. $10,-000.

"Q. You were for that originally before you had any discussion? A. Yes, sir.

"Q. And at any event you didn't go up after the discussion? A. No, sir.

"Q. You came down? A. Yes, sir.

"Q. And at the time of these discussions, you had all agreed at about $8,000, and some still holding up higher? A. Yes, sir.

"Q. And you finally came down, and the balance finally came down, and you got together on $8,750? A. Yes, sir."

And the context shows that Wappler was there referring to the "Dr. Ellis Case" as being one of the "extraneous" matters and as constituting the subject of the "discussions." On direct examination he had said several times that "we had not agreed to the absolute amount when it was mentioned at the other end of the table," and he described the "motion" of that case as being substantially as stated by Clark and others. Wappler was the juror who injected into the deliberation the discussion of the probability that Dr. Moore had insurance to cover his losses, and this, he said, was done prior to the time when "the absolute amount" was agreed to. Clark, it will be remembered, said that insurance was discussed in the very beginning, and Goldberg and other jurors said it was discussed prior to agreement upon the verdict; and Clark's statement about the "Dr. Ellis Case" was made, apparently, in immediate response to Goldberg's reply to Wappler's suggestion about insurance. Wappler's testimony, viewed separately or viewed with all relevant facts and circumstances, is not rightly subject to an interpretation which would place the incident as happening otherwise than before the verdict was finally agreed upon. Jurors Hinson, Dean, Miers, Holcomb, and Funk testified that they did not hear, or at least did not recall having heard, any discussion of the matter. Juror Gerstman testified as to other matters, but he was not examined about the discussion of the "Dr. Ellis Case." Juror Conillo said that he knew of no discussion before the verdict, but

· that there was such "after the verdict was sealed." Conillo was interviewed by Judge Campbell and Dr. Scardino about the matter a few days before he testified. With reference to that interview he was interrogated, and answered as follows:

"Q. Isn't it true that you stated to Dr. Scardino and Mr. Campbell, who was with me in the trial of this case, that one of the jurors before the verdict argued that if a little gauze in the Ellis Case was worth $15,000, this big gauze ought to be worth as much money? A. No, sir; I didn't tell him that. I told him I wasn't positive. Everything I told him, I told him I wasn't positive.

"Q. You were not positive? A. No. sir."

Two jurors did not testify.

[5] We are convinced that the "Dr. Ellis Case" incident occurred before the verdict was agreed upon. If this is not certain, there is at least substantially reasonable doubt that it happened afterward. Since this doubt exists at all events, and under any permissible view of the record, we must treat the occurrence as transpiring during the deliberations of the jury prior to verdict reached.

### The Insurance Matter.

As pointed out already, some matter of insurance was mentioned in the beginning of the jury's deliberations. This apparently provoked Goldberg's statement that "he didn't think the whole damn family' had that much insurance." Clark understood Goldberg as referring to the Ivey "family." If Goldberg made the statement described, it would indicate that some specific amount of insurance had been mentioned; and this, in turn, would argue that more than one juror suggested the matter, in view of Wappler's testimony.

Wappler testified that before there was agreement upon the final amount of the verdict he "broached the subject." He said:

"Well, now, I don't know whether I first broached the subject (i. e. of insurance) or whether somebody else did, but I said that probably Dr. Moore had insurance because I know there are policies written to take care of such contingencies where a doctor may be liable for suit in his practice."

Being asked why he mentioned the matter, he said: "It just came to me like a flash, after we were agreeing on the amount.". He said that the "Dr. Ellis Case," the insurance matter, the "appendicitis case," and the matter of attorneys' fees were mentioned separately by different jurors at about the same time—at a time when various ones were "holding out" for verdicts in the amounts theretofore suggested by them. Thereupon he testified as follows:

"Q. How did it happen it all came up about that time, in a bunch? A. I guess they wanted to talk about it and sort of relieve themselves. Why each individual—why he was holding out.

"Q. Indicating a state of mind on the subject? A. Perhaps so.

"Q.. In other words,. it evidenced the thing they had in their minds? A. Perhaps so."

Under examination by the court, he stated:

"I might say this, we first put down all our figures and each man's name before we had discussed anything extraneous" (i. e. the matters above referred to as having come along in a "bunch"). "We had put our figures down which we felt was correct, and naturally we wanted to stay with those figures."

' The figure he had "put down" was $10,-000, and for a verdict in that amount he was then "holding out"; according to his version the thought of the "probability'" of Dr. Moore's insurance came to him "like a flash," and he suggested it to the other jurors as justification for the $10,000 verdict for which he "was holding out." This means, of course, that the information was volunteered and used by Wappler for the purpose of causing Goldberg and the other "$5,000" jurors to increase the amounts for which they were then "holding out," because, in using the information to justify a claim for a $10,000 verdict, he meant to impress the others that a verdict for a lesser sum would be unjust and improper. The Court of Civil Appeals states that Wappler testified that this incident happened "after the verdict had been agreed upon," but, as is obvious, that expression is not correct.

Goldberg testified that this matter was mentioned prior to the verdict. Clark said he remembered it being mentioned, but that he could not say whether it was before the verdict was reached. In another connection he said that some insurance matter was mentioned in the beginning of the deliberations. Hinson and Miers said that they did not remember the incident; Dean declared that nothing was said about insurance; Holcomb and Funk said that they heard no such discussion; Gerstman was not examined on the point; and Conillo claimed that it took place after "the verdict was sealed."

### Attorneys' Fees.

This matter is described by the various jurors who were examined about it as follows:

Goldberg: Before a conclusion was reached as to the amount to be awarded, it was said that, whatever the verdict rendered, Mrs. Ivey would not be the recipient of that amount; that she would probably get 50 per cent. of it and the attorneys get 50 per cent. of it.

Wappler did not know just when the matter arose. "Several took part in the discussion, they said that it might be the case was taken on a 50 per cent. basis, and, after paying her expenses, they thought the woman might not be reimbursed enough; that is what was meant, I don't say it was put in·

112 277 SOUTH WESTERN ·REPORTER (Tex.

those words." This was one of the "extraneous" things referred to in the excerpts quoted from Wrappler's testimony in connection with our discussion of "insurance" above.

Hinson and Conillo: Nothing was said about attorneys' fees "as I know of."

Clark: Before the verdict was agreed upon, the division of the amount between the attorneys and the plaintiffs was mentioned. "I think some one, I don't remember who, said that some attorneys got as much as half and others got possibly one-third, and sometimes they would take a case for so much money, and somebody mentioned the fact, if she were to only get $4,000 awarded by the jury that more than likely in actual money she would only get $2,000, and I remember distinctly of saying myself it wasn't any of our damn business how much she got out of the verdict, it didn't concern us a bit." ·

Dean and Funk did not hear anything about attorneys' fees or what the attorneys would get out of the verdict.

Holcomb, Gerstman, and Miers were not examined on the point.

### The Appendicitis Case.

Hinson mentioned this in the jury room, in connection with a discussion by other jurors as to "what the damages would be in the case" (i. e. the Moore-Ivey Case), according to his testimony he said, in the jury room: "I believe in a fair verdict. I had a niece operated on at the Baptist Sanitarium, but that don't make me feel any different." "I said the doctor had removed the appendix, and it was not infected."

Other versions of the matter are these:

Wappler: "There was a man got up—it was the time we were discussing the exact amount—and he said a niece of his had been operated on and the doctor had told the mother it was an infected appendix, but the doctor had told the man himself that it was not infected, it was an innocent appendix, and he took it out, and the woman wanted to sue the doctor, but the man said if she sued the doctor he would testify against her, and that he wouldn't countenance a suit against a doctor." "That was said about the time we were discussing the lawyer's fee." This was one of the "extraneous" matters referred to by Wappler in the testimony quoted above in relation to "insurance."

Holcomb: "I heard a juror make the statement he had a niece operated on for appendicitis; he said that the girl's mother wanted to sue, and he said if she did he would testify against her."

Funk heard some remark about the operation.

Goldberg: There was a reference made by one juror to an operation case in his family. "I don't remember his exact words, I can give the substance of his utterance. He stated there had been an operation on a girl of

his relationship, I believe his niece, and that prior to this operation the doctor said it was an infected or diseased appendix, and after the operation it was found, while he did remove the appendix, it was not diseased, and the girl's mother had threatened to sue, and this juror had prevailed upon her not to sue."

Miers and Dean did not hear any such discussion; Conillo, Clark, and Gerstman were not examined about it.

### Making Doctors More Careful.

Goldberg testified that before the verdict was reached "there was a statement made that as the result of our verdict doctors would be more careful." Hinson said he did not think the subject was mentioned in the jury room. The other jurors who testified were not examined about it.

### The Effect of the Misconduct.

The Court of Civil Appeals is in agreement with us upon the proposition that the acts, etc., of alleged misconduct transpired substantially as charged. It differs with us, to some extent, upon the chronology of the events; but the main point of disagreement is as to the effect to be ascribed. Its ruling upon the assignments is based upon this reasoning:

"Some of the jurors who testified on motion for new trial said they heard some of the matters mentioned by Goldberg mentioned in the jury room, but that such matters did not influence them in arriving at their verdict; that in forming their verdict they were influenced only by the evidence and charge of the court; and the remaining jurors testified that they did not hear any of the matters mentioned, and that their verdict was based on the evidence and charge of the court. Several of the jurors, who heard the matters referred to mentioned, testified that they heard none of them mentioned until after the verdict had been reached, prepared, and sealed. * * * We think the trial court could well have concluded from the testimony adduced on the motion for new trial that no juror of the commonest sort of honesty and intelligence could have been induced by the mention of the matters testified to by some of the jurors to find that Dr. Moore left the sponge in Mrs. Ivey. They had no tendency to throw any light on the questions as to who left the sponge in her body. We also think that, when the evidence on the motion is taken and considered as a whole, it justified the trial judge in concluding that the suggestions shown to have been made in the jury room, of which complaint is made, did not influence the jury, or any of them, in arriving at their verdict."

There is error in the statement that "several of the jurors, who heard the matters referred to mentioned, testified that they heard none of them mentioned until after the verdict had been reached, prepared, and sealed." A careful examination of the record will show that this statement is correct only in a very restricted sense. Conillo is the only juror who definitely claims that whatever

discussion he heard took place after the verdict was finally reached, and he referred only to the "Dr. Ellis Case." He says that he heard no mention of the "attorneys' fees" at all, and he was not examined as to the matters. Nor can we agree with the Court of Civil Appeals in the idea that the information volunteered in the jury room "had no tendency to throw any light on the questions as to who left the sponge in Mrs. Ivey's body." That is true enough in a sense, but when the frailties, or the strength, of human nature are taken into account, as they must be, it is not true. The record presents a narrow case of negligence; the charge against Dr. Moore is that he left this gauze in Mrs. Ivey's body some 8 months before it was discovered there, and, while the evidence, considered with presumptions rightfully based, is sufficient to uphold the finding of negligence, it is sufficient also to have supported a finding against negligence. Whether Dr. Moore left this sponge in the wound is much more a question of probability than of certainty. If it be made know to the jurors who are engaged in solving the mooted question that other doctors have been guilty of like charges, that information, and the arguments deduced from it, might easily turn the balance. Too, its tendency was to cast doubt upon the diligence and skill of doctors as a class and to engender a prejudice which may have reacted against Dr. Moore in respect to this issue.

[6] The ruling of the Court of Civil Appeals, except for the erroneous statement of the evidence already pointed out, rests upon the supposed fact that such of the jurors as heard the discussion of extraneous matter prior to the verdict testified that they were not influenced thereby, but they that were governed by the charge of the court and the evidence. In other words, those self-serving declarations are made conclusive, and that is error. Southern Traction Co. v. Wilson, supra; Hines v. Parry, supra; San Antonio Traction Co. v. Cassanova, supra; J. H. W. Steele Co. v. Dover, supra.

In San Antonio Traction Co. v. Cassanova, supra, Chief Justice Fly has this to say of like protestations:

"We see no particular force in such denial, because the influence of such discussions is so subtle and appeals to human nature so strongly that the influence might, in some instances, be exerted without the juror being aware of it. In other instances fear of punishment at the hands of the trial judge would cause denials of influence upon the verdict."

In Hines v. Parry, supra, it is said:

"To our minds, the circumstances surrounding this jury's ultimate findings do not appear to us to be free from unwarranted influence. It is true that the members of the jury who are questioned strenuously deny that their minds were affected by the statements made to them. But this is only natural. Men are slow to admit

277 S.W.—8

such influence in their deliberations. They may not have realized that they were being influenced."

The pertinent record as a whole must be considered, and if, upon such review, facts or circumstances appear which leave it reasonably doubtful that one or more jurors were not influenced, in spite of their protestations to the contrary, a vicious effect must be assumed. In this case we do not believe any juror who heard the extraneous matter discussed prior to verdict leaves the nonexistence of effect clear even when his testimony alone is considered.

In the affidavits attached to the motion for new trial, Jurors Goldberg and Wappler each says, "That to the best of my ability I endeavored to reach a verdict according to the law and the evidence." Goldberg heard all of the discussions prior to verdict. With reference to the effect of the "insurance" matter, he testified as follows:

"Q. Are you in any doubt in your mind as to the effect of information of that sort upon your mind in considering the assessment of damages, comparing the two propositions—one where you would consider the defendant insured, and the other where you would consider he was not insured? A. I am not able to answer that question.

"Q. (By the Court) You are not able to? A. No, sir; I don't know whether the hearing of this discussed had any effect on me or not. I don't recall that it had any effect on me, and I don't know whether it did or did not.

"Q. Would that" (i. e. probability of insurance) "have affected your verdict in any way? A. No, sir; whether he had insurance or not—we were governed by the evidence.

"Q. (By the Court) You were doing your best to reach a conclusion according to the evidence? A. Yes, sir. * * *

"Q. Did this mention that he probably had insurance, did that have any effect upon you in arriving at the amount you arrived at? A. It did not."

And as to the other extraneous things he testified:

"Q. Did anything in there that you have mentioned have any effect upon you in arriving at the amount you agreed upon? A. I don't believe they did.

"Q. (By the Court) Was this verdict, as finally agreed upon by you, based upon the charge of the court, as you understood it, and the evidence, and that alone? A. To the best of my ability, yes, sir.

"Q. To the very best of your ability? A. Yes, sir.

"Q. Uninfluenced, in so far as the best of your ability is concerned, by anything else? A. I was not influenced by anything that was said in the jury room."

In respect to "insurance," he says: First, he is unable to answer whether he is in doubt as to whether the information had effect "upon his mind in considering the assessment of damages. Second, he does not know whether or not the discussion had any effect upon

him—"I don't recall that it had any effect on me, and I don't know whether it did or not"; and then he says that there was no effect upon him. Manifestly Goldberg himself was in doubt, even when the matter of "insurance" is separately mentioned, and the effect inquired about is restricted to the "amount of damages." If the matter stopped here, we would be in serious doubt also; but it does not stop here, and things presently to be mentioned make it reasonably clear to us that he was influenced. As to things other than "insurance," and as to things generally, Goldberg's statement that he "was not influenced by anything that was said in the jury room" is necessarily limited, if not discredited, by the unquestioned fact that he first opposed a finding of negligence and, after consenting to such a finding, first thought $4,000 "would be a plenty." His general statement that "to the best of his ability" he considered only the charge of the court and the evidence means little, at best, because the exertion of maximum ability would not exclude the subconscious effects spoken of in the cases cited; and it means even much less when the facts and circumstances of his change on all the material issues are remembered.

Goldberg at first "was in favor of rendering a verdict of no damages"; such is his own statement, and if is supported by every juror who testified on the subject. He did not believe there was negligence, and so stated in the beginning, coupling his expression with an offer to bet that Mrs. Ivey would be in Niagara Falls within 60 days. His opposition to a finding of negligence was so strong that the other jurors displaced him as foreman and put in his stead Clark, who immediately "took the lead in trying to swing" him "over." From the time when the case was given the jury (apparently during the afternoon) until about 15 minutes after 11 o'clock, Goldberg maintained his original position on "negligence." And, when he finally agreed to the conclusion sought by the other jurors on that issue, he believed an award of $4,000 would amply compensate Mrs. Ivey; but he subsequently agreed to an award of $8,750, more than double the amount he first thought sufficient.

No explanation whatever of these changes of opinion was offered by Goldberg; and no explanation of his change in amount was offered by any other juror, except that implied by Clark, when he told of the plan to postpone discussion of negligence on the theory that Goldberg might change on that question if the amount of damages to be awarded should not be too high. Counsel for Mrs. Ivey did not interrogate Goldberg as to the reasons for his final agreement to a finding of negligence, but by another juror they sought to furnish an explanation. On this point Clark testified that after the verdict "had been sealed" Goldberg "made a speech" in which he declared that (during his opposition to the finding) "he was taking the evidence of the case, and had not seen the two pieces of gauze side by side," and that he then pointed to Juror Holcomb, and said, "That is the bird that swung me, he got down there by the side of me and showed me those two pieces of gauze and absolutely convinced me those were the same pieces." Holcomb testified that he heard Goldberg say, after the verdict had been reached, that he (Holcomb) was "the man that convinced him by a comparison of the gauze," and, as to the making of the comparison, Holcomb said, "I laid them out there and showed him what I thought was right, and he never said anything and finally agreed it was right." The "gauzes" thus compared were the piece which it was claimed Dr. Moore had left in Mrs. Ivey and a gauze of the size commonly used in the hospital where the operation was performed. The circumstance of the comparative sizes of the gauzes was relevant, in view of other evidence, and had some probative force; and the emphasis given it in the jury room by the comparison might have contributed something to Goldberg's change of front. But it may not have had the complete effect ascribed to it by Goldberg per the testimony of Clark and Holcomb, for the pieces of gauze were introduced in evidence and were "presented to them for inspection" at that time. They were frequently exhibited to witnesses in the presence of the jury; they were measured in the presence of the jury, and their respective dimensions and descriptions were given and discussed many times during the examination of witnesses. The very subject-matter of Holcomb's "comparisons" was before the jury, and was emphasized, time and again, during the trial, and Goldberg must have been exceedingly dull if he did not have that matter in mind at the beginning of the jury's deliberations and at the time he was offering to "bet within 60 days she would be in Niagara Falls." He claims he followed "the evidence," and yet he strongly opposed a finding of negligence for several hours after he had seen and heard all the facts and circumstances involved in Holcomb's "comparison." And, too, the remark quoted would seem to indicate his opposition was predicated on disbelief in portions of Mrs. Ivey's testimony which were not related to the facts and circumstances embraced in the "comparison." Here, again, if absolute certainty were required, and reasonable doubt were not the rule, and, further, if the declaration of a juror were so conclusive as to exclude consideration of subconscious influence, it might well be conceded that an adequate explanation of Goldberg's change of opinion on the primal issue of negligence is offered. But such certainty is not required, and a juror cannot thus foreclose contemplation of the extraneous things

which may have contributed their portion to the result.

But, if it were thought that his final agreement on negligence is properly accounted for in such a way as to exclude the possibility of contribution by the guilty knowledge, that would not answer for his change from $4,000 to $8,750 on the amount of the award. No explanation, certainly no adequate one, is advanced for this result. On the "evidence," and under the charge of the court, he first thought $4,000 was "a plenty," even if negligence existed as averred. Between that time and the moment when he agreed to $8,750, he had heard it argued that Mrs. Ivey would not get all of the $4,000 if it was awarded, but that the attorneys would get some of it, probably 50 per cent., and that therefore "the woman might not be reimbursed enough"; he had heard it stated and argued that in another case a woman had been awarded $15,000 for a small piece of gauze "being left in her nose"; he had heard discussed the probability that Dr. Moore had insurance so that he would suffer no loss, no matter what the amount of the award; and he had heard the inflammatory information of malpractice by other doctors and the suggestion that this verdict might prove a deterrent of negligent practices generally. Either of these things, independently considered, might have added something, and all of them, viewed together, probably did contribute a material sum, to the forces which wrought the change of opinion.

There were at least two other jurors who originally stood for a verdict of not more than $5,000. About this there is no conflict in the evidence, and it was shown by several jurors. Funk was one of the $5,000 men. He disclaimed hearing discussion of the "Dr. Ellis Case" until after the verdict; if it was discussed before the agreement upon the verdict, he did not hear it. He heard the "appendicitis case" referred to before the verdict was agreed to. He says he did not hear the other extraneous matter discussed at all, and that he was not influenced by anything but the evidence. He gave no reason for his change to $8,750. Another of the $5,000 men was Poske, who was not present, and who did not testify upon the motion for new trial. As to him, then, the record shows his presence on the jury and attendance upon its deliberations, that he was so situated that he could easily have heard whatever discussion there was, and that for some unexplained reason he agreed to a verdict for $8,750, after having stood out for a considerable time for a lesser amount. In this situation he may, or may not, have been influenced by the misconduct. Since the acts complained of undoubtedly took place, and since the acts were such as were competent to exert improper force, there is, of course, substantial reason to doubt that he was free of the influence during the progress of change in his opinion. See Hines v. Parry, supra; San Antonio Traction Co. v. Cassanova (Tex. Civ. App.) 154 S. W. 1190, 1194; Yanez v. Traction Co. (Tex. Civ. App.) 126 S. W. 1176.

As to Clark, Wappler, and other jurors who at first wanted a larger verdict, the argument is made that the misconduct could not possibly have had effect; but the contention seems to us inconclusive. It will be recalled that Goldberg thought $4,000 "would be a plenty," and Poske and at least one other juror stood out (for a considerable time) for $5,000. The guilty knowledge of Clark et al., and their use of it on others, may have prevented a verdict in a sum less than $8,750. Clark himself declared that he, and others, had considered the fact that "the other woman" had received $15,000, and "therefore we figured $8,750 a fair figure" for Mrs. Ivey. If it were conceded that Clark made this statement immediately after the verdict, still, because of its res gestæ nature, it would clearly indicate a prior effect on his mind; and, if the declaration was made before final agreement, as Clark in one connection says it was, and as we believe it was, it affords indubitable proof of the influence of its subject-matter on Clark. Clark was originally in favor of a verdict for $12,750; knowledge of the "Dr. Ellis Case" no doubt assisted him in arriving at that figure to begin with and most likely kept him from being unwilling to agree to a figure less than $8,750. The statement of this knowledge by Clark may have supported other jurors in their demands for $12,500, etc., and contributed something to their declination to go lower than $8,750. It is proper to ascribe like possibilities and probabilities to the other extraneous matter. The situation may have been truly described by Wappler, when he told about all of the discussion having occurred "in a bunch" after each juror had put down on paper the amount for which he "stood" (Wappler having put down $10,000, for which he held out until "along toward the last"). Being asked, "How did it happen it all came up about that time?" He said, "I guess they wanted to talk about it and sort of relieve themselves. Why each individual—why he was holding out." And that the wrongful mention and consideration of the improper "evidence" may well have had the effect of preventing an agreement by Clark, Wappler, et al. to a figure lower than $8,750, and of inducing Goldberg, Poski, et al. to agree to $8,750 as the award, is obvious.

[7] Because of belief that the verdict, in material respects, is tainted with improper influence, and the certainty that there exists substantial ground for a reasonable doubt as to its purity, we recommend that the judgments of the trial court and of the Court of Civil Appeals be reversed, and that the cause be remanded.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court. We approve the holding of the Commission of Appeals on the questions discussed in its opinion.