## GILES v. TYSON. (No. 8128.)

Court of Civil Appeals of Texas. San Antonio. Jan. 23, 1929.

Tarlton & Lowe, of Corpus Christi, and R. B. Russell, of San Antonio, for appellant.

Boone & Savage and Felix Raymer, all of Corpus Christi, for appellee.

FLY, C. J. This suit was instituted by appellee against appellant to recover damages alleged to have arisen from the negligence of appellant in applying the X-ray to his arm to locate a piece of steel, which had been forced into his arm while he was working as an automobile mechanic and was imbedded in the periosteum of the ulna bone of his left arm. It was alleged that the X-ray was negligently applied and the arm of appellee so burned and permanently injured as to prevent its use, and render him incapable of pursuing his occupation as a mechanic. The cause was submitted to a jury through special issues, and on their answers judgment was rendered against appellant in the sum of $7,500.

Forty-six assignments of error are copied into the brief, under which 11 propositions of law are presented. The first and second propositions are overruled. The allegations as to the piece of metal being driven into the arm of appellee were mere matters of inducement, leading up to and showing the necessity for the employment of a physician and the consequent use of the Roentgen ray to locate the metal. It is clear from the pleadings that damages were not sought from appellant for any injuries except those arising from the negligence of the physician, and the issues submitted to the jury confined their verdict to damages arising from the negligent application of the rays to the arm of appellant. Appellant objected to the emphasis put upon the negligence of appellant in the issues submitted by the court.

Appellee had taken the depositions of Dr. Dalton Richardson, of Travis county, as an expert Roentgenologist, and before the trial began appellant presented a motion to suppress the depositions on the ground of defects in the certificate of the notary public who took the depositions, and the motion was granted and the depositions suppressed. Afterwards the parties announced ready and the trial proceeded for several days, and then, without any order setting aside the order suppressing the depositions, they were offered in evidence by appellee, and over the objections of appellant were presented to the jury as evidence in the case. The court, in the qualification to the bill of exceptions, stated: "That the original depositions were again offered in evidence and admitted after J. W. Dibrell, the notary who took the same, appeared as witness in behalf of plaintiff and had identified the depositions offered, and by his testimony, and all matters in relation thereto, had satisfied the court that the depositions offered had not been tampered with, that they had been deposited by him in the mails and were in the exact condition as when deposited, and after the court had permitted him to correct his certificate as shown by the defendant's bill of exception No. 2."

The bill of exceptions, to which the court referred, showed Dibrell's testimony, in which he stated that he was a notary public in Travis county, that he took the depositions of Dr. Dalton Richardson, and identified the commission, deposition, and envelope which had contained the same, that they were in the same condition as when put in the envelope, and that he sealed the envelope and deposited it in the post office at Austin for transmission to Corpus Christi. He said: "I filled in the certificate on the envelope, and in some fool way I overlooked signing it. I put the seal on the outside of the envelope and wrote my name across here." He stated that he took a "second set of depositions," and "returned those through Mr. Felix A. Raymer, one of the counsel for plaintiff in the case." The answers were identical with those in the first depositions.

He thus states how he took the second deposition: "In taking the second set of depositions, I used a carbon copy of the answers taken in the first set. I read over each question to the witness, and he read his answers back. I didn't transcribe the answers the second time. The carbon copy of the answers

had been supplied to me by Mr. Raymer the morning of the day I took them. The second set of interrogatories were also supplied to me by Mr. Raymer. I took them out to Dr. Richardson's house, and read over each interrogatory, and he held these answers in his hand and read them back to me as his answers. They are the identical answers that had been supplied to me by Mr. Raymer. I, of course, first swore the witness to that second set of depositions as I did the first set, and then he proceeded to answer. I erased the date in the jurat, and also in my certificate, and placed another date in there. My certificate is a carbon copy of what I had made in the first instance."

After the foregoing statement, Dibrell was, over the objection of appellant, permitted to sign his omitted name on the envelope of the original depositions of Dr. Richardson. It is a little obscure in the record as to whether the "warmed over" depositions taken on carbon copies, or the suppressed depositions, were used in evidence, although it is indicated in the qualification to the bill that the suppressed depositions were used, and not the carbon copy. In either event, the depositions were not such as are demanded by the statute. To say the least, the whole proceeding in connection with the suppressed depositions was very informal, if not illegal, and not justified by any statute of the state.

■ Whether the depositions were illegal or not, they were admitted in evidence over the protest of appellant, and he sought to withdraw his announcement of ready for trial, which he made after the depositions had been suppressed, and not having in view a trial in which the depositions would be used as evidence. The evidence of the expert Roentgenologist was very important, and doubtless had great influence with the jury, and the court erred in not permitting appellant to withdraw his announcement of ready for trial. It was apparent that the appellant was surprised at the action of the court in connection with the resurrection and use of depositions which the court had suppressed. We sustain the second, fourth, and fifth propositions.

■ The discovery of the rays known as Roentgen or X-rays, marked a mighty stride in the science of surgery, making operations certain which in former times had been experimental and unsatisfactory. It is a dangerous agency, as is electricity, and for quite a time after its discovery its application or administration was marked with accidents and incurable injuries, not only to the patient, but to the person administering it. However, after years of research, study, and experimentation, the new rays of light have become docile servants and invaluable agents in relieving pain, destroying disease, and rendering possible the most delicate surgical operations. The science of the X-ray has become certain and exact, and its application

and use is known and understood in all civilized and advanced communities by the administrators of the rays. Such being the status of the Roentgen, or more properly Röntgen, rays, it is a fixed and exact science and the safe mode of its application and use is, or should be, as well known in one community as another, and in city, town, or village there can be but one proper way to apply the useful, but dangerous, agency.

Such being the case, an expert in the use of X-rays can testify to its proper use in village or city, The proper use of it in New York would be the proper use of it in Austin or Corpus Christi, and any other use of it by a physician or scientist would be negligence. If the exposure of the patient to the rays must not exceed a certain time in New York, it should not exceed that time in the remotest village; if it is the best practice to use an aluminum filter in Austin, it would be equally so in Corpus Christi, or San Antonio, and it would be equally as culpable or negligent for a person to use the dangerous agency ignorantly or negligently in one community as in another. If, as contended by appellant, the same care must be used as in similar communities, it cannot be contended that the city of Corpus Christi is in a lower class than Austin, and you cannot apply the nonprogressive rules of backwoods communities to Corpus Christi, as compared with Austin, San Antonio, or any other civilized American community.

A physician using the surgeon's knife without sterilization, or without the use of modern antiseptics, would be just as guilty of negligence as would the physician in Rochester, Minn., or in Baltimore, Md., in the two greatest hospitals of the world. Where the exercise of discretion or care is called for in a field where there must necessarily be danger and uncertainty, or where the necessities of the locality or the occasion call for a discretion in the means used, then the case would be governed by rules arising in like exigencies. We do not, however, believe that a physician would be excused for not using proper anæsthetics, antiseptics, and other well-established means for protecting the patient in surgical operations, simply because the community was ignorant and nonprogressive. To sum the matter up: We hold that, if it be negligence for the X-ray to be applied without stabilizer or aluminum filter, or at a certain distance from the flesh, with a certain time exposure, in Austin, it would be negligence in Corpus Christi. We therefore hold that, if the rules formulated by Dr. Richardson are scientific and the only safe way, in Austin or any other American city, that they would form the only safe way in Corpus Christi. We overrule the sixth proposition, for the reason that it is not applicable to the facts of this case.

There was no error in the matters com-

plained of in the seventh proposition. There was no comment upon or expression of opinion as to the evidence in the special issue of which complaint is made. It left the jury unhampered by any opinion of the court in passing upon the issue. Neither was there any error in the tenth issue presented to the jury, of which complaint is made in the eighth proposition.

■ The trial judge confined the damages strictly to those arising from the action or nonaction of appellant, and it was unnecessary to give the special charge requested as shown in the ninth proposition.

■ The charge requested, and of whose refusal complaint is made, in the tenth proposition, was properly refused. The facts did not raise the issue of insurance by a physician of the means used by him in treating the patient, but the only issue was: Did the appellant use the well-known and certain methods in applying the rays in an ordinarily careful and skillful manner?

■■ In the motion for new trial, appellant set up misconduct upon the part of the jury, in that, before answering the different issues, the jury determined the amount of damages to which they thought appellee was entitled; in that three of the jurors had discussed the fact that appellant had indemnity insurance protecting him from the consequences of such cases as the one then before the jury; also that during the deliberations of the jury the question of attorney's fees to be paid by appellee were discussed by them, and also found what is denominated a quotient verdict; also that one of the jurors left the jury room and inquired of a deputy sheriff as to the matter of costs in the case, and the jury also discussed the relative wealth of appellant and appellee, and determined that appellant was wealthy and appellee a poor workingman, and that he should be awarded damages in the light of the relative financial condition of the parties. It was in evidence that at least some of the jurors discussed attorney's fees and other expenses to be incurred by appellee while deliberating on the damages, and also the matter of indemnity insurance carried by Dr. Giles. There was "open talk" in the jury room about the attorney's fees to be paid by appellee out of any damages allowed by the jury. There was some evidence to show that the general question as to whether appellee was entitled to damages was determined by the jury before any of the issues were answered by them. After it had been decided that appellee was entitled to damages, then the issues were answered.

There was evidence showing that the amount of attorney's fees and other expenses was fully discussed, some of the jurors suggesting that the attorney would get one-half of the amount recovered by appellee. The foreman swore as to attorney's fees: "I don't remember whether I figured that or not, but it was figured; if I didn't, some of the other boys did; they figured it like this: That the verdict was $7,500 and, if the attorneys got half, Tyson would get $3,750, and then by the time he paid the Morriss Motor Company that fourteen hundred and some odd dollars, it would leave Tyson about $2,000, and they also quoted some of the witnesses saying his arm could be put back in good shape for $500, and they also said that would leave him $1,500, for him and wife to live on a year while he was getting well, so he could start to work like he was before; that would leave him— in other words, there would be $1,500 left." A number of the jurors testified to the discussion of matters foreign to the case and not in evidence while the question of damages was under consideration, and while some disclaimed that such matters had any effect on their verdict, the evidence leads to the inevitable conclusion that the discussion of insurance, of attorney's fees, and first passing on the amount of damages before answering the issues submitted, and making those answers conditional on how the matter of damages would be affected, had their influence.

Clearly the action of the jury was gross misconduct, and clearly the amount of damages was affected by the consideration of matters outside the evidence, and which could not have been admitted in evidence by the court. This court has considered many cases of misconduct of juries, but none in which the conduct of the jury was more reprehensible than in this case. There was very little conflict in the statements of the different jurors as to what occurred, and the evidence as a whole leads to the inevitable conclusion that the damages assessed were based upon matters not in evidence. A desire was evinced that the appellant should not be found guilty of negligence, and the verdict seems to rest, at least with some of the jurors, upon the consideration of outside matters to sustain the verdict of damages against appellant. At least one juror, in testifying as to the conduct of the jury, stated: "We tried to see if we could answer these questions in a way that wouldn't hurt the doctor, that he wasn't negligent, but it seemed like we couldn't do it; they had to be answered yes or no."

In article 2021, Rev. Stats. 1911, the granting of a new trial on the ground of the misconduct of the jury was placed in the discretion of the court, and this court first construed that statute and laid down the rule that appellate courts have no authority to disturb the ruling thereon, unless it is apparent that there has been an abuse of such discretion. Foley v. Northrup, 47 Tex. Civ. App. 277, 105 S. W. 229. That case was followed by the Supreme Court, as well as different Courts of Civil Appeals, for a time, and was cited with approval by this court in the case of San Antonio Traction Co. v. Cassanova, 154 S. W. 1190, where the question of the authority of appellate courts to disturb a de-

456

cision of the trial court on an application for new trial on the ground of misconduct of a jury was held, and it was still held that the rule must be a clear abuse of discretion of the district judge before the appellate court would reverse. That undoubtedly is the only reasonable rule under the statute then under consideration, but that rule was modified and qualified by the Supreme Court, so as to give power to appellate courts to set aside a judgment of the trial court in such matters, if there was a reasonable doubt as to the effect that the misconduct had upon the amount of the verdict. Railway v. Gray, 105 Tex. 42, 143 S. W. 606. That decision opened wide the box of Pandora and the grounds of setting aside the action of the lower court were made broader and more comprehensive, until the discretion of the district court in such matters was destroyed and the discretion practically lodged in the appellate courts.

In the case of Southern Traction Co. v. Wilson (Tex. Com. App.) 254 S. W. 1104, the reasonable doubt theory culminated in the holding that where one juror had a doubt as to whether the consideration of outside matters influenced his verdict, the judgment should be reversed. But that decision has been intensified in the case of Moore v. Ivey (Tex. Com. App.) 277 S. W. 106, where it is made contrary to public policy, and threatening the very existence of fair trials, to permit the discretion of the trial judge to prevail where misconduct of the jury has been made the basis of a new trial. Says Judge Luther Nickels for the Commission of Appeals, and for the Supreme Court: "It may be clear that 11 (or a lesser number) of the jurors were not, to any degree, influenced by the improper conduct; yet if it remains reasonably doubtful whether one (or a larger number) was, ·or was not, influenced, the vice remains, and the verdict must be set aside, * * * because each juror can rightly agree to the verdict only when guided solely by the instructions of the trial judge and the evidence heard in open court." Judge Nickels then invokes the doctrine of reasonable doubt, and follows it up by invoking the overworked doctrine of public policy, and gives warning as to what dire results may follow if the appellate courts do not assume the discretion confided by the old statute in the trial judge.

It seems that, as the opinions of the Commission of Appeals, for the Supreme Court, had effectively destroyed that part of the statute confiding in the discretion of the trial courts the granting or refusing of new trials for misconduct of the jury, an amended statute on the subject was placed in the Revised Statutes of 1925, being article 2234. In that article it is provided: "Where the ground of the motion is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury or that they received other testimony, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the testimony received, or the communication made, be material." No question of reasonable doubt, of sound discretion, or public policy can arise under the present statute, but it becomes a question as to the judgment of the district judge in holding that the misconduct, or the testimony received, or the communication made, be material, is proper or improper. It will hereafter be merely a question of the soundness of the decision of the trial judge on the subject of the materiality of the misconduct, the outside testimony, or the communication to the jury.

However, if the action of the trial judge be tested under the statute giving him discretion, or under the statute of 1925, his judgment refusing a new trial was erroneous, and that alone would necessitate a reversal of the judgment. There was a clear abuse of discretion on the part of the court in refusing a new trial; and each act of misconduct of which appellant complains was undoubtedly material and must have affected the verdict of the jury.

The judgment will be reversed and the cause remanded.