## TEXAS & P. RY. CO. v. BRADLEY. *
(No. 3412.)

Court of Civil Appeals of Texas. Texarkana.
June 22, 1927.

Rehearing Denied June 30, 1927.

1. Master and servant ⬷217(3)—Refusal of instruction denying recovery if injured section hand had equal facilities with railroad of ascertaining condition of car door hook held proper.

In action against railroad by member of section gang for injuries when car door secured by hook invisible to plaintiff fell, refusal of instruction to deny recovery if plaintiff had equal facilities with defendant of ascertaining condition of hook *held* proper.

2. Master and servant ⬷219(2)—Ordinary care by employer demands search for latent defects, but employee need only observe obvious defects.

Ordinary care on part of employer demands inspection and search for defects, even latent and hidden ones, and causes of danger, where machinery and appliances are furnished incident to work, while ordinary care by employee requires only attention and observation of known or obvious defects and perils therein.

3. New trial ⬷144—Evidence held to show verdict was not entirely quotient verdict.

In action by injured section hand against railroad, evidence of jurors *held* to support conclusion that verdict was not entirely quotient verdict accepted by jury as agreed amount of damages, and trial court did not abuse discretion in so concluding.

4. New trial ⬷44(1)—"Misconduct" of juror relates to course of action wrongfully affecting rights of party to suit (Rev. St. 1925, art. 2234).

"Misconduct" of juror, within Rev. St. 1925, art. 2234, relates to course of action about case by which rights of party to suit are wrongfully affected, and statute makes no exceptions or conditions.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Misconduct.]

### On Rehearing.

5. New trial ⬷44(3)—Considering and including attorney's fees in arriving at amount of damages in negligence case constitutes "misconduct of a juror" (Rev. St. 1925, art. 2234).

It is "misconduct of a juror," within Rev. St. 1925, art. 2234, for such juror in negligence case to consider and include attorney's fees in arriving at amount of damages or base his verdict in part on attorney's fees.

6. New trial ⬷143(2)—Jurors' oral testimony that verdict in negligence case was arrived at by considering and including attorney's fees held competent (Rev. St. 1925, art. 2234).

Oral testimony of jurors that verdict in negligence case has been arrived at by consideration and inclusion of attorney's fees is competent and should be received and considered by court in determining whether there has been misconduct, in view of Rev. St. 1925, art. 2234.

7. Appeal and error ⬷842(7)—Supreme Court may review evidence to determine whether it was reasonably doubtful that there was prejudicial misconduct of jurors.

Where it is alleged in negligence case that jurors considered attorney's fees in arriving at verdict, Supreme Court may review evidence to determine whether or not it was "reasonably doubtful" that there was prejudicial misconduct, since such question is one of law and not of fact.

8. New trial ⬷56—Doubt as to whether there was prejudicial misconduct of jurors should be resolved favorably to those against whom improper conduct was committed.

In determining whether it was reasonably doubtful that there was prejudicial misconduct of jurors, doubt should be resolved in favor of keeping jury verdicts free from suspicion and in favor of those against whom improper conduct was committed.

9. New trial ⬷144—Evidence held to show prejudicial misconduct of jury in considering attorney's fees in arriving at verdict in personal injury action.

In personal injury action against railroad by section hand, evidence *held* to show prejudicial misconduct of jury in reaching verdict, in that certain jurors considered question of attorney's fees.

Appeal from District Court, Marion County; R. T. Wilkerson, Judge.

Action by De Witt Bradley against the Texas & Pacific Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

The action was to recover damages for personal injuries. There was verdict for the plaintiff, from which the defendant has appealed.

The plaintiff was a member of the section gang, and engaged in the course of such employment. Several wrecked freight cars were destroyed by fire on the main line, and the iron parts were salvaged and placed near the right of way for the purpose of being transported to another point. The section gang, of which the plaintiff was a member, was assigned to the duty of loading the scrap iron into the cars of the train sent there for the purpose of transporting the iron. The cars of the train were coal cars, each described as being about half the height of a box car, but open at the top and without any roof, about 33 feet long, and having two doors on each side. The doors were attached by hinges to the sides of the car, near the top, and when closed formed a part of the sides of the car. These doors were opened from the bottom, by lifting or raising the lower end outward and up to the top of the car. The doors, when opened, are held up by a latch, or hook, which is about four inches long and bolted to the

top side of the car and fits into an eye, or ring, bolted to the outside bottom part of the door. When the doors are thus raised or opened in an upward direction, the hook and staple, or ring, holding the doors up are not visible to a man standing on the ground, being in the rear of the raised door. The doors were three feet wide and three feet high, and of heavy iron material, requiring two men to open and latch them. The train was propelled by the regular train crew up to the point where it was to be loaded, while the section gang were standing there on the ground waiting to load it. The doors of the cars, it seems to appear, were open at the time the train came up and stopped. The section gang began at once to load the scrap iron into the cars. The occurrence and injury can be correctly described by quoting the evidence of Jud. Hurd, a member of the section gang, viz.:

"We were loading the material into the car. Mr. De Witt Bradley and Louis Hurd were working together outside. Berry Ellis and Ben. Lee were in the car. We had been loading about ten minutes. We loaded the small pieces first. We just threw some of it in the car. At the time De Witt Bradley got hurt we were loading a brake beam that the brakes hang on. The beam was heavy. It took us three to lift it, and it was all we could do. We were putting it through the door, because we couldn't get it over the sides. It was so heavy that when we threw it in and it hit the floor it caused the door to come down. It didn't touch the door. When it hit the solid floor the door fell—it just flopped over. The door caught De Witt Bradley's head between the door and the floor of the car. * * * Berry Ellis looked at the hook to fasten the door again. I saw it when he tried to fasten it. I was standing right under him. The hole or ring wasn't large enough for the hook to catch in."

After the door fell down it was again opened, and the section foreman, standing in the car, held it open with his hands while and during the time further loading was accomplished. It would not securely hold up by means of the latch. It does not appear that the train, or any of the cars, was at that place of loading before that trip.

The following is the evidence concerning prior knowledge of the hook and fastening. The section foreman testified:

"I don't know which one put the door up. I don't know whether the door was open when the train came up or not, but I don't think it was."

Jud. Hurd testified:

"I don't know who hooked that door up there. It came there, already there. I wasn't on the train. I guess it was a brakeman did it. They had been loading it before it came there, and I guess somebody in the other section did it."

Appellee testified:

"I didn't have anything to do with opening the door. I don't know who opened it. I don't know anything more about the condition of the door before it fell on me than it was open."

A. C. Williams, a member of the section gang, testified:

"When the train got there we were all working on the same side of the track. We were loading over the top of the car, and on the side through a door. I don't know who opened the door. It was open when it stopped there."

It was practically without dispute, as testified by the section foreman, that "standing on the ground one couldn't see the hook holding the door; it was not in view from the ground after it was fastened up." And it was undisputed that the door which fell and struck the plaintiff was caused to do so when the heavy iron was dumped into the car, because "the hook was so short it would not go in the ring far enough to hold it," or "the hook couldn't get in the ring far enough to hold," or "the hole was not large enough for the hook to securely catch in." The plaintiff exposed himself to the danger of injury from the door's falling down without knowledge of its insecure fastening or timely opportunity to know of it before his injury.

The plaintiff alleged that the hook, or fastening, was insecurely fastened or was in a defective condition, and that such was negligence on the part of the defendant, and the proximate cause of his injury. The defendant pleaded a general denial, contributory negligence, and assumed risk. The case was submitted to the jury on a general charge. The evidence warrants the finding of the jury, as involved in the verdict, of negligence as alleged proximately causing injury to the plaintiff, and that the plaintiff did not have timely knowledge, actual or constructive, of the alleged negligence, and was not precluded by assumed risk of injury. The evidence is conflicting as to the extent of the injury. There is evidence going to show a grievous and permanent injury to the extent of epilepsy. There is evidence going to show a slight injury and a complete recovery therefrom. If it be true, as found by the jury, that the plaintiff suffered injury to the extent of epilepsy, the amount of damages awarded does not appear, as a fact, to be unwarranted.

Bibb & Caven, of Marshall, and J. H. Benefield, of Jefferson, for appellant.

S. P. Jones, of Marshall, for appellee.

LEVY, J. (after stating the facts as above). [1] The court charged the jury that although the defendant company may have been guilty of negligence in respect to the condition of the car door fastening, yet the plaintiff assumed the risk of injury by falling of the door, precluding a recovery in case the plaintiff before the injury timely knew, or might have known by the exercise of ordinary care, of the defective fastening of the car door and the danger incident thereto. The

defendant excepted to the charge, in effect upon the ground that it limited the inquiry to whether as a matter of fact the plaintiff had actual or constructive knowledge of the defective fastening of the car door and the danger of injury from its falling, and denied inquiry as to the comparative knowledge of the plaintiff and the defendant of the defective condition and danger of the door fastening. In keeping with the objection so made, the defendant requested a special charge, and insisted that it should be given in addition to the regular charge, in order to allow inquiry to the extent of whether the plaintiff knew, or should have known by the use of reasonable care, of the defective condition and danger of the door fastening, or had had equal means with the defendant of knowing the same. The special charge requested, and refused by the court, reads:

"You are instructed that it appears from the evidence that the door was caused to fall and strike the plaintiff by reason of the bent condition of the hook which held the door. Now, if you believe from the evidence that the plaintiff had equal facilities with the defendant of ascertaining the condition of said hook, and the danger, if any, incident thereto, then and 'in that event the plaintiff assumed the risk of the injury, and you will return a verdict for the defendant."

It is doubtful that the evidence raises the issue of assumed risk at all; but assuming that it does, the rule invoked by the special charge has no application to the present case, and the court did not err in refusing it. Here the defect which caused 'the injury was .the disengagement of the hook, which was bent, letting the door fall down, due to the vibration of the car when the heavy load was emptied into the car. The car doors were raised when the train stopped at the place for loading the cars, and the hooks holding the doors open were hidden from view and could not be seen by a person on the ground, as plaintiff was and required to be. The latch was behind or in the rear of the door when raised. While the hook was a simple thing, it was not a tool used by plaintiff in his usual work, and on this occasion was entirely hidden from his view, without opportunity to see it. It was not the duty of the plaintiff to get up into the car and inspect the latch and see that it was securely fastened before beginning the work of loading the car. The car was not the section car usually used by plaintiff in the work, but a car operated by the train crew and specially placed there on the occasion for immediate loading by the section gang. While it may be true, as an abstract doctrine, that both employer and employee will be held to know that which, by the exercise of reasonable diligence, they might have learned, still this rule does not by any means place the employer and the employee. upon an equality as to the acts necessary to constitute negligence. If the defect is patent and visible, then, if both employer and employee have ample and equal opportunity to know of its existence, the employee will ordinarily be deemed to have assumed the risk; but he is not bound to search for hidden or latent defects, nor to make a critical examination of the places and appliances in which or with which he is set to work. This obligation, however, does rest upon the employer.

[2] Ordinary care upon the part of the employer demands inspection and search for defects, even latent and hidden ones, and causes of danger, where machinery and appliances are furnished, incident to the work; while ordinary care on the part of the employee requires attention and observation of known or obvious defects and perils therein. In this case the employee had the right to presume that the company, owing a special duty to guard against the danger probable from the insecure hanging of the door, would perform that duty; and being ignorantly innocent of the condition of the door, he would not have assumed the risk of injury therefrom in performing his duties by and under it. The employee would have waived the precaution which it would have been the duty of the company to take, and have assumed the risk of injury therefrom, in case only there were attendant circumstances or appearances reasonably awakening his suspicions as to its character. The court fully so instructed the jury, and the defendant had the benefit thereof.

The assignments of error upon which the second and third propositions are predicated are overruled.

[3] Error is next predicated upon the refusal to grant a new trial because of alleged misconduct of the jury in the manner of assessing the amount to recovery. It is contended that (1) the verdict was a quotient verdict, arrived at by agreement of the jury to accept the result of a majority vote, and (2) two of the jurors considered and included attorney's fees in arriving at the amount of damages. There was great difference of opinion among the jurors as to the amount of damages that should be awarded, and various preliminary methods were employed by them to reconcile their differences of opinion. They retired Friday noon to consider their verdict, and returned a verdict Saturday afternoon. They finally agreed Saturday, in an effort to reach a verdict, to eliminate the two highest votes for damages and to divide by ten the sum of what each of the other ten jurors had named. After this was done, and after the result was obtained, the two jurors standing out for the high amounts of $30,000 each would not agree to the average amount so reached. These two jurors stated that they would agree and "come to $25,000." The foreman of the jury proposed that—

"Here is a line; let's take a vote on $22,-500, and every one that is willing to take a vote with me for $22,500 step over to this

side." All of the jurors then "walked over the line except Mr. Latham." Mr. Latham was the juror voting for the lowest amount, and objected to awarding $22,500. After discussion of the evidence he finally consented to that amount of damages, "walked over the line," and then the verdict was written out and duly returned into court. Two of the jurors improperly considered attorney's fees in arriving at the amount of damages. Their evidence in that respect is quoted. The juror Bramlett testified:

"During our deliberation, and while we were in the jury room, somebody mentioned attorney's fees, but their attention was called to the fact that the court had charged us not to mention that, and it was not mentioned any more. It was mentioned Friday night, I think. After the question of attorney's fees was mentioned I didn't consider it in arriving at my verdict. I was trying to go according to the charge, and didn't concern myself over that and didn't discuss it at all. It was reasonable to consider that the attorneys would get some fees. I did not know whether the attorneys would get some part of it as fees or not. It might have gone through my mind that the attorneys might get part of it, and it might not. I didn't vote for a larger amount on that account than I otherwise would have. * * * Yes, I made an affidavit some days ago before Mr. Stutz, stating as follows:

"'The matter of attorney's fees was mentioned; that is, the part the lawyers would get out of the amount we awarded as our verdict, but there was not much talk about it. However, I voted for $20,000, and in arriving at this amount I naturally considered in my mind that the lawyers had to get part of it, and I made it larger than I would had I known the lawyers would not get part of it. I did not talk that, but it was in my mind.'

"At the time I made that sworn statement that was my idea about the matter. When we took the first vote I voted for $20,000, and I know I had not thought about it (attorney's fees) at that time. It (mention of attorney's fees) could have had some influence on my mind, but I don't think it did."

The juror Jaynes testified:

"The question of attorney's fees was not mentioned in the jury room, that I heard. I didn't mention it to anybody. I don't know whether anybody else said anything about it or not. I could not say what they said privately. I didn't discuss it with them. As I understood the charge, we were charged not to discuss attorney's fees. I tried to reach a verdict under the charge as given, and finally agreed upon the verdict rendered in the case, and felt that it was fair compensation that the plaintiff was entitled to under the charge. I felt that it would take that to compensate him for the condition he was in and the lack of ability to earn money and the suffering he had gone through. I didn't consider in my own mind any certain amount that I would give the plaintiff because he had to pay an attorney. My idea was to compensate the plaintiff for the damages he had sustained. I knew the attorneys would get some part of it, but not the amount. So far as I could I excluded attorney's fees from my

consideration in arriving at the verdict, and the amount I voted for was what I thought was right."

The same juror further testified, in answer to questions propounded, as follows:

"Q. Now, in the consideration of your verdict in this case, did you take into consideration in your own mind that the attorney might get some part of the verdict? A. As far as taking it into consideration in my own mind, that was unavoidable.

"Q. Well, you did consider it in your own mind? A. Yes, sir; a fellow would have to.

"Q. That would naturally cause you to give a larger amount to take care of it? A. Yes, sir.

"Q. And it did in this case, didn't it? A. Yes, sir."

The other two jurors called to testify stated that they did not hear any mention of attorney's fees during the deliberation upon a verdict, and that the verdict was reached by discussion of the merits of the case. The remaining members of the jury were not called upon to testify.

Considering the evidence on the part of the jurors in its entirety, the conclusion is fairly warranted, as made by the trial court, that the verdict was not entirely a quotient verdict accepted by the jury as the agreed amount of damages, and therefore we do not feel warranted in saying that the trial court abused his discretion in concluding as he did upon that issue. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606.

[4] But as respects the second ground, it appears from the testimony of the two jurors that the amount of damages for which the verdict was returned, so far as they were concerned, included allowance to some extent of attorney's fees. The juror Jaynes is not doubtful but that he considered "that the attorneys might get some part of the verdict," and "did in this case give a larger amount to take care of it." Such proof brings the case within, and the point is governed by, the settled rule announced and applied in the following cases: Traction Co. v. Wilson (Tex. Com. App.) 254 S. W. 1104; Moore v. Ivey (Tex. Com. App.) 277 S. W. 106; Ry. Co. v. Robinson, 285 S. W. 269, 46 A. L. R. 1507; Ry. Co. v. Harvey (Tex. Com. App.) 278 S. W. 839; Ry. Co. v. Skorodynski (Tex. Civ. App.) 292 S. W. 638; Railway Co. v. White (Tex. Civ. App.) 202 S. W. 794. As laid down in these cases the verdict is vitiated and will be set aside in case the proof leaves it "reasonably doubtful" that the size of the verdict was increased by consideration of attorney's fees, although only one juror improperly bases his verdict in part upon attorney's fees, even "though the extent be indefinite" and notwithstanding "as a matter of fact the verdict of the jury perhaps was not excessive in law under the facts in the record." We are unable to distinguish the

present case in principle from those cases, and therefore feel bound by the settled ruling therein. While in those cases, as asserted, there "was discussion by the jury" of attorney's fees, yet it was the substantive fact "that some extra amount" was actually added for attorney's fees, and not the mere discussion of it, that rendered the verdict unlawful as excessive of authority or discretion to assess, and required it to be set aside. The very prejudicial act or "misconduct" on the part of members of the jury that the court sat in review upon and gave relief against was the allowance to the plaintiff of a "sum of money" that he was not lawfully entitled to have the defendant pay to him. The jury, nor any member, had no discretion and were forbidden by law to allow any amount of money for attorney's fees. Therefore, such deliberate, unauthorized, and forbidden act of allowance of attorney's fees was classed as dishonesty in a legal sense committed against the property rights of the defendant, constituting "misconduct" within the meaning of the statute. A court of review, as was determined, could not wisely do otherwise than order a trial de novo. "Misconduct" of a juror, as used in the statute, relates to a course of action about the case by which the rights of a party to the suit are wrongfully affected, and the statute does not make any exceptions or conditions.

In keeping with the cases cited above, the judgment is reversed and the cause is remanded for another trial.

### On Rehearing.

The appellee insists that there was error in reversing the judgment, because (1) the present case does not come within the ruling of the cases cited and they have no application, and (2) the trial court's ruling on the motion for a new trial, based upon the allowance by the two jurors of attorney's fees, was conclusive and is binding upon the appellate court. It is insisted that the evidence of the two jurors that they considered and included attorney's fees in arriving at the amount of damages cannot legally be received to avoid the verdict. The argument is largely directed at the impropriety of the evidence as such impropriety is discussed in McDonald v. Pless, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300; and Sanitary Dist. of Chicago v. Cullerton, 147 Ill. 385, 35 N. E. 723.

[5, 6] We think the following cases, cited in the opinion, unquestionably hold (1) that it is "misconduct of a juror," within the meaning of the statute, for a juror in negligence cases to consider and include attorney's fees in arriving at the amount of damages, or base his verdict in part upon attorney's fees, and (2) that the oral testimony of the jurors that the verdict had been so arrived at is competent and should be received and considered by the court: Southern Traction Co. v. Wilson (Tex. Com. App.) 254 S. W. 1104; Moore v. Ivey (Tex. Com. App.) 277 S. W. 106; Ry. Co. v. Skorodynski (Tex. Civ. App.) 292 S. W. 638; Ry. Co. v. White (Tex. Civ. App.) 202 S. W. 794. And the statute expressly authorizes "the court" to "hear evidence thereof from the jury" in cases "where the ground of the motion for new trial is misconduct of the jury." Article 2234, R. S. of 1925. As we observed in the original opinion, concerning the cases cited:

"The very prejudicial act, or 'misconduct,' on the part of the members of the jury that the court sat in review upon and gave relief against was the allowance to the plaintiff of 'a sum of money' that he was not entitled to have the defendant pay to him. The jury, or any member, had no discretion and were forbidden by law to allow any sum of money for attorney's fees. Therefore such deliberate, unauthorized and forbidden act of allowance of attorney's fees was classed as dishonesty in a legal sense committed against the property rights of the defendant, constituting 'misconduct' within the meaning of the statute. A court of review, as was determined, could not wisely do otherwise than order a trial de novo."

And these cases, and others, firmly lay down the rule that—

"Where the evidence taken by the trial court on motion for new trial leaves it reasonably doubtful whether misconduct of the jury has resulted in injury [affected amount of verdict or decision of any material issue], the motion should be granted." Ry. Co. v. Robinson (Tex. Com. App.) 285 S. W. 269, 46 A. L. R. 1507; Public Service Co. v. Alexander (Tex. Com.) App.) 280 S. W. 753; and other cases.

[7, 8] As plainly stated, "the Supreme Court" can review the evidence to determine whether or not it was "reasonably doubtful" that there was prejudicial misconduct. Public Service Co. v. Alexander, supra. For "whether there is such reasonable doubt is a question of law, and not one of fact." Hubb Diggs Co. v. Bell (Tex. Com. App.) 293 S. W. 808. And "the doubt" as determined "should be resolved in favor of keeping jury verdicts free from suspicion and in favor of those against whom the improper conduct was committed." Traction Co. v. Wilson, supra; Wheat v. Lancaster (Tex. Civ. App.) 284 S. W. 629.

[9] Therefore was the present case within the established rule? The members of this court think it was, and that there is nothing in the present case to warrant a departure from the settled rule. The juror Bramlett stated on the hearing before the trial court that the matter of "attorney's fees" was "mentioned" or referred to "in the jury room." That was an overt act of misconduct, capable of being controverted by the other jurors, and was not "a secret thought" or matter resting in the breast of the juror. And the probability of the occurrence so affirmatively asserted by the juror is not nega-

tived by the other members of the jury. The two jurors called to testify in that respect, besides the juror Jaynes, merely stated that they "did not hear any mention of attorney's fees during the deliberation." The remaining members of the jury were not called to testify concerning or in explanation of the occurrence. And it is "reasonably doubtful" that the occurrence affected the amount of his verdict. The juror stated in his examination that the mention of attorney's fees did not affect or influence his verdict, and that he "didn't vote for a larger amount on that account than I otherwise would have." But when confronted with his voluntary affidavit made on the fourth day after the verdict the juror admitted that "at the time of the sworn statement," or affidavit, he had a very different "idea of it." The sworn statement referred to recites that—

"The matter of attorney's fees was mentioned; but there was not much talk about it. However, I voted for $20,000, and in arriving at this amount I naturally considered in my mind that the lawyers would get part of it, and I made it larger than I would had I known the lawyers would not get part of it. I did not talk that, but it was in my mind."

According to that statement, the juror actually considered attorney's fees in arriving at the amount of his verdict. There is no pretense that the juror was overreached in the affidavit. The statement made in the affidavit and the statement made on the hearing of the motion are not both correct, and both statements are not incorrect. Which of the statements shall be taken as correct? That is the exact situation of the juror in the case of Traction Co. v. Wilson (Tex. Com. App.) 254 S. W. 1104, wherein it was said:

"It is reasonably doubtful, to say the least of it, whether he was influenced or not by these extraneous matters [the 'discussion of attorney's fees'] in arriving at the amount of the verdict he was willing to award."

The juror Jaynes was not doubtful about what he did. The substance of his testimony was: "I knew the attorneys would get some part, but not the amount," although, "I didn't consider in my own mind any certain amount that I would give the plaintiff because he had to pay an attorney," yet "I did take into consideration in my own mind," and it "was unavoidable," the fact "that the attorney might get some part of the verdict," and "did in this case give a larger amount to take care of it." The juror admitted, in effect, that he considered and actually included in his verdict some amount as attorney's fees, but could not state what the amount was. This juror first voted and held out for $6,000, and finally agreed on a verdict of $22,500. This is a circumstance of weight, in a way fortifying the statement of the juror that he actually included attorney's fees in arriving at his verdict. Considering the evidence as a whole, it may not reasonably be said that there is not some corroborative or fortifying evidence of the testimony of the two jurors going to show the probable occurrence of the alleged misconduct.

Appellee asks to be allowed to enter a remitter of $2,500 as remedial of the alleged misconduct. The request would be granted if it were possible from the record to say what amount should be remitted. The juror Bramlett raised his verdict from $20,000 to $25,000. But the juror Jaynes raised his verdict from $6,000 to $22,500.