**RUSSELL et al. v. ADAMS et al.** (No. 9280.)

Court of Civil Appeals of Texas. Galveston.
May 4, 1929.

King, Wood & Morrow, of Houston, for appellants.

Cole, Cole, Patterson & Kemper, Bennett B. Patterson, and Charles Reinhard, all of Houston, for appellees.

PLEASANTS, C. J. This suit was brought by P. A. Adams for himself and his minor son, David Adams, against appellants O. C. Russell and wife and H. R. Kivel, to recover damages for personal injuries to the minor plaintiff alleged to have been caused by the negligent operation of an automobile owned by defendant Russell and being driven for them by defendant Kivel. The defendants answered by general demurrer and general denial and by pleas of contributory negligence and unavoidable accident.

The trial in the court below with a jury resulted in a verdict and judgment in favor of plaintiff David Adams for the sum of $2,500 for pain and suffering caused him, and in favor of plaintiff P. A. Adams for $2,100 for loss of services of his son during his minority, $227 medical bills, and $400 damages to plaintiff's automobile.

The damages for which the suit was brought and recovery had were caused by a collision of appellants' automobile with the automobile of plaintiff P. A. Adams, in which the minor plaintiff was riding. No question is raised in appellants' brief as to the sufficiency of the evidence to sustain the findings of the jury upon the issues of negligence, contributory negligence, and unavoidable accident presented by the pleadings, and it is therefore unnecessary to set out any of the evidence upon these issues.

Under pertinent assignments appellants' first complaint of the judgment is that the court erred in submitting to the jury the question of amount of damages sustained by P. A. Adams by the loss of the services of the minor plaintiff, without instructing the jury that, in determining the value to the father of the services of the minor, they should take into consideration the expenses to the father of the maintenance and education of the minor.

The complaint is without merit. The rule invoked by appellants is only applicable in a case in which a parent sues for loss of services of a minor child who has been killed by the negligence of the defendant. In such case, by the death of the child the parent is relieved of the expense of the maintenance and education of the minor, and in determining the money value of his loss the costs of such maintenance and education must necessarily be considered. But where, as in this case, the minor is not killed, but rendered incapable of performing the services theretofore rendered, the parent's obligation to provide maintenance and education continues, and manifestly should not be considered in arriving at the value to him of the lost services of the minor. Texas & P. Ry. Co. v. Morin, 66 Tex. 133, 18 S. W. 345; Texas & P. Ry. Co. v. Breck, 83 Tex. 526, 18 S. W. 947, 29 Am. St. Rep. 675; Houston & T. C. Ry. Co. v. Lawrence (Tex. Civ. App.) 197 S. W. 1020.

The expense of maintenance and education being immaterial in determining the question of the value of the services of the minor, appellants' further contention that, because the amount of these expenses were not shown, the verdict of the jury fixing the value of such services is not supported by the evidence, cannot be sustained.

The next complaint is that the petition fails to allege that the injuries to the minor incapacitated him from performing any services for plaintiff, and that there was neither allegation nor proof of the probable duration of the incapacity of the minor, and no testimony sufficient to raise the issue of the loss to plaintiff of the value of the minor's services during the remainder of his minority. This contention of appellants is advanced in several propositions. The fourth proposition, which presents the contention in its clearest and strongest phase, is as follows:

"There being no allegation in plaintiffs' petition that the minor plaintiff would be in any manner incapacitated until he reached the age of twenty-one years, and there being no testimony in the record showing that the minor plaintiff would be wholly incapacitated until he reached his majority, there is no evidence in the record to support the answer of the jury finding for the adult plaintiff in the sum of $2,100.00 for the value to him of the services of his son from the date of the injury until he becomes twenty-one years of age."

The facts as to the character and extent of the injury to the minor are thus shown by the record:

P. A. Adams testified: "My son, David Adams, attended school at Jim Hogg school, which is a junior high school. I believe he was in the seventh grade; I don't know whether it was the low or high seventh."

"After he had been at home that two weeks we then took him back to the Baptist Sanitarium, because the nerve specialist wanted to operate on him; he had to go into his spine and draw off some fluid from the base of the brain. David stayed in the hospital four days on that occasion, and then we took him back home, and as near as I can remember he was confined to his bed at home for seven days. Since that time David has been able to take very little exercise, or do any kind of work or manual labor. He had not

been able to go back to school since that time. Dr. Cox, Dr. Brenner, and Dr. Applebe have treated my son since this injury.

"Before David was injured in this accident he was a helpful and useful boy. He ran most of the errands for me, did things I wanted him to do, and did the chores around the house. He was also talented in both the violin and voice. After David was injured in this accident he was not able to take up his violin until about six or eight weeks ago, when the doctor permitted him to take up his instrument and try it out. He could not pursue his studies because when he read or studied his music he complained of a severe headache and his eyes hurt him. * * *

"My son had never had any serious illness prior to this accident. He was slender for his age, but I could not say that he was delicate.

"So far I have not trained my son in any particular line, by which he could earn money in the future. All he is doing now is taking violin and voice lessons."

The testimony of David Adams, the minor plaintiff, upon this subject was as follows:

"When I was in school last I was in the low eighth grade. I had been making pretty good grades; I had always been able to make passing grades. I made an average of four on almost all of my subjects. In school five is considered excellent and four is good. Five is always considered as between ninety and a hundred, and four is between eighty and ninety. I was not the best, but was an average. I read and kept up with my studies. I have not been able to go back to school since this accident. I didn't go back to school because the doctors would not let me. Drs. Cox, Brenner and Applebe are the ones that wouldn't let me go back to school. * * *

"When I was at home I would do just the ordinary household errands; I would go to the ice house, go and get my father in the afternoon, take my little brother to school, and when my mother was working I would take her to school and then take the car back home and walk back to school. My mother was working in the cafeteria in the John H. Reagan high school. I am not now able to do the things I did before this accident, because I can't exert myself half like I used to. I can't study, I can't read very long without sharp pains in my head and my eyes bother me terribly. I went to a picture show once or twice; the doctor did that as a test to see about my eyes. * * *

"I am not taking any school work. It is a fact that I want to be a musician, but I do not intend to drop my school work; I intend to go to school some more. It is necessary to go to school to be a musician; you cannot become a musician and be ignorant. It is not a fact that I expect to be a violinist and a singer and devote most of my time to that. I still intend to go to school and take the regular academic work.

"I am not the same boy that I was before the accident. This nervousness is part of my trouble. I cannot do what I used, I am not right, that is all. There are lots of things I used to do that I cannot do now. I used to read books, and I can't do that now because my eyes bother me. My head aches, and I can't stand long; I can't practice long like I used to.

"My life is very monotonous now without anything else to do. There is not much that I can do to amuse myself except sit around. I used to practice on my violin for as much as an hour a day. Lots of times when I had hard work in school if I didn't get through at night I would get up early in the morning and study. This nervousness makes me feel like I will faint, and I have to get a tight grip on myself and fight against it all the time."

Mrs. P. A. Adams, mother of the injured boy, testified as follows:

"David is fourteen years old. When I was at work David would take me to school, if he was not over-loaded with his studies and had time. After he took me to the school he would take the car home and put it in the garage and then go to school. Prior to the accident David went to school regularly, he never lost a day. My husband was working at the Medical Arts Building just before this accident, and if David had time he would go after his father in the evening. David was always an industrious and obedient boy, I never had any trouble with him.

"Prior to this accident David was in the high seventh grade and had passed to the low eighth. He did not attend the John H. Reagan school, he went to the Jim Hogg school. He was taking the full course, mathematics, and I think they had taken up some algebra, just like they do in the seventh grade, the regular junior high studies. David always came home after school, unless I was with him. When he was at home he would help me around the house; he helped me clean house that Friday morning before he was hurt. He helped with the general chores around the house.

"David has not gone to school any since he returned from the hospital. The doctors would not let him go to school. Prior to his injury David would play with the other boys in the community. He would play ball around the yard. He also drove the car and helped me around the house when I asked him. He is not able to do those things now like he did; he is not any better. If he were able I would send him to school, and he would gladly go."

Dr. Applebe, witness for plaintiff, testified as follows:

"The last time I examined David Adams was last Saturday morning. From my examination I would say that the boy has only partially recovered from his injury. I would advise strongly against permitting the boy to

attend school this fall. At the present time he is about eighty per cent normal. He cannot read for more than ten or fifteen minutes without starting up a blinding headache. This traumatism or pressing on the brain sometimes has a tendency to drift into something else, that is quite frequent, especially where recovery does not take place in the first year. There is a general lessening in efficiency which persists throughout life. That is the more frequent thing. I would say that occurs in about twenty per cent of the cases. When I say there is a lessening in efficiency I mean physically and all other ways. I never did see or treat this boy before his injury.

"From my knowledge of medicine and nervous diseases, and from my familiarity with David Adams' condition, I would say that it is not possible to tell for what length of time the condition which now exists will continue. That is a matter that time will have to tell. My opinion is that probably in a year's time he will be able to return to school. Of course he might develop traumatic epilepsy, which occurs in seven per cent of the cases where there is a bruised brain.

"As a result of this thing one gets a lowering in ambition; the individual does not seem to have the same pep; he very often cannot stand going out in the hot sun without getting a blinding headache, and he is a little more subject to headache and feeling badly; a kind of semi-invalid over a given period of time."

Dr. R. L. Cox testified as follows:

"David has not entirely recovered from this injury; he is still very nervous, and he has low blood pressure. I would say that his condition is the result of the injury he received in that accident. He is not a normal healthy child; he is not one hundred per cent efficient. I would say that his efficiency has been decreased from twenty-five to thirty per cent as a result of that injury."

It is to be observed that the proposition above quoted assails the verdict for $2,100 in favor of appellee P. A. Adams on the ground that there is no evidence to support this finding of the jury. Neither the question of whether this verdict is so against the great weight and preponderance of the evidence as to be clearly wrong nor the question of excessiveness in the verdict is raised by any of the propositions presented in the brief.

■ We cannot hold upon the testimony before set out that there is no evidence to sustain the finding of the jury that P. A. Adams has been damaged in the amount found by the jury by the loss of the services of the minor plaintiff during the remainder of his minority. The testimony shows that the injured minor was, prior to his injury, a healthy, active boy of more than average intelligence; that he was obedient, industrious, and studious; stood high in his classes at school; and had a talent and love for music which his parents were assisting him to cultivate. While pursuing his school and musical studies, he actively assisted his parents in the domestic affairs of the family. Since his injury he has not been able to carry on his studies or perform his usual domestic service. The testimony of the physicians leave it uncertain, when, if ever, he will regain his condition of usefulness and promise of future success.

In this state of the evidence, the jury were authorized to find that P. A. Adams was damaged by the loss of the services of the minor plaintiff, and to fix the amount of the damage at such sum as in their judgment would be the reasonable value of the services of the minor of which the plaintiff would probably be deprived because of defendant's injury of the minor. Brunswig & Co. v. White, 70 Tex. 504, 8 S. W. 85; San Antonio Traction Co. v. White & Co. (Tex. Civ. App.) 60 S. W. 323; Texas & P. Ry. Co. v. Raney, 86 Tex. 363, 25 S. W. 11; Cotton v. Cooper (Tex. Civ. App.) 160 S. W. 597.

■ The suggestion in the quoted proposition of appellants', that appellees' pleadings are not sufficient to entitle P. A. Adams to recover for loss of the services of his minor son during the continuance of his minority, is, we think, fully answered by the following allegations of the petition:

"That as a consequence of the accident his (the minor's) support will be a burden to his father, and that his father will realize nothing whatsoever for his services and earnings which would have come to his father until the boy became twenty-one years of age."

Under an appropriate proposition appellants further complain of the refusal of the trial court to grant their motion for a new trial on the ground of misconduct of the jury. The claimed misconduct of the jury is thus stated in the motion for new trial:

"The verdict of the jury and the judgment based thereon should be set aside and a new trial granted herein on account of the misconduct of the jury while deliberating on their verdict, in that after retiring to consider of their verdict, and while so deliberating thereon, the jury discussed the likelihood of the defendants' having liability insurance upon the car which struck the minor plaintiff's car, and the probable terms of such policy, and the fact that any judgment that might be rendered against them would be paid by an insurance company, and were advised by one of their number that, based upon his experience, it was his opinion that such policy covered the defendants and protected them in the payment of any judgment that might be rendered against them, even though the car was not being driven by the owner at the time of the accident but was being driven by his agent and discussed at length the matter of whether such insurance applied and protected the defendants in view of the fact that

the car was not being driven by the owner, and decided among themselves that such insurance did in fact apply; and further discussed the experience of one of their number with an insurance company carrying liability insurance upon his car, and the payment of such insurance company of damages because of the injury done by him, and decided from such juror's experience that the insurance company carrying insurance on the defendant's car would have to pay any judgment rendered in this case; that the jury in determining their verdict were influenced by such suggestions and discussions. The defendants pray the court to hear evidence upon this ground of the motion."

In support of this motion, the appellants presented the testimony of five of the jurors, including the foreman. All of this testimony shows that the question of appellant's insurance was mentioned in the jury room in discussing the testimony of one of appellant's witnesses, who had stated in testifying as to a previous conversation with interested parties relevant to the issues in the case, that an insurance adjuster was present when this conversation occurred. Four of the five jurors testified that, when this testimony was mentioned in the jury room, the foreman told the jury that that question could not be discussed or considered by them, and that it was not discussed or considered.

■ The record shows that the statement of appellant's witness on the trial as to the presence of an insurance adjuster during the conversation inquired about was voluntary and not in response to the question asked by appellant's counsel, and that, when counsel for appellees cross-examined the witness, he had him give the names of those who were present during the conversation and repeat the fact that an insurance adjuster was present. There was no objection to this testimony, and it is not apparent from the record that any objection could have been properly sustained thereto. The appellees certainly had the right to know, as a possible predicate for impeachment, who was present when the alleged conversation occurred, and if the witness could not give the names of those present to have him describe them by their occupation, residence, or business, or in any other way by which appellees might identify them. Appellant could have asked the court to tell the jury not to consider the fact that an agent of an insurance company was interested in the discussion of the merits of this suit, but no such request was made or instruction given the jury. It was by no fault of appellees that this testimony got before the jury, and neither the appellant nor the trial court seemed to have considered it prejudicial.

In these circumstances, it is difficult for us to understand how a charge of misconduct of the jury can be predicated upon the mention in the jury room of this testimony. Four of

the jurors testified that, when this testimony was mentioned in the jury room, the foreman informed them that the question of appellant's insurance must not be discussed or considered, and it was not discussed or considered. One of the five jurors who testified on the hearing of the motion states:

"My name is Bert Otto. I was a member of the jury that rendered a verdict in the case of P. A. Adams et al. v. O. C. Russell et al., tried in the 61st District Court. While the jury was in the jury room, and while we were discussing amounts and all of that one of the jurors brought up the question of insurance, and said Russell had insurance on the Packard car, he said he had six thousand dollars insurance, and the foreman said, 'We can't discuss that.' Then we went on discussing it just the same, and some fellow said he couldn't collect that any way because it was not his car, and then one of the jurors went on and told a story of the time he was driving somebody else's car and ran it through Levy Brothers' window and the insurance company paid for it. I don't remember that juror's name, but he was a little man, and he was a loan broker. That discussion occurred in the jury room at the time we were discussing the case. That matter was not discussed after we were discharged.

"After the discussion was had I couldn't help but believe that the defendant had insurance. I don't know so much about the insurance company having to pay any judgment we rendered; that is where the argument came up. That matter was discussed in the jury room."

On cross-examination:

"The foreman said we couldn't talk about that insurance matter, because it was not in the case. One fellow said suppose this fellow was a poor man and couldn't pay. That discussion of insurance did not have any effect on me in rendering a verdict in this case. I would have rendered the same verdict regardless of whether any discussion of insurance had been had. I don't know where that fellow got the information that Mr. Russell had six thousand dollars insurance, but that did not influence me. I would have rendered just the same verdict that I did if that had not come up."

■■ We think it clear that, if all that occurred in the jury room was the mention of the fact that the evidence indicated that appellants had insurance on their automobile, and that when this fact was mentioned the foreman told the jury it should not be discussed or considered, and it was not thereafter discussed or considered, no misconduct of the jury was shown. If it could be held that the accidental injection into the testimony before the jury of the fact that an insurance adjuster was interested in the case was so prejudicial to appellants' case that its effect could not be removed by a proper instruction to the jury not to consider it, then

appellants should have requested the court to withdraw the case from the jury and continue it until another jury could be obtained. Appellants could not refrain from objecting to the testimony, make no request to instruct the jury not to consider it, and no motion to withdraw the case from the jury and reserve complaint until after the jury had returned a verdict against them. A litigant is not permitted to thus speculate upon the verdict of a jury.

It is equally clear that, if the discussion testified to by the witness Otto occurred in the jury room, there was such misconduct on the part of the jury as required the trial court to grant the motion for a new trial. Moore v. Ivey (Tex. Com. App.) 277 S. W. 106; Hines v. Parry (Tex. Com. App.) 238 S. W. 886; Great West Mill & Elevator Co. v. Hess (Tex. Civ. App.) 281 S. W. 234.

In each of these cases, however, there was no issue of fact as to what occurred in the jury room, and the opinions in these cases only hold that, when facts outside of the evidence are discussed in the jury room, and such facts are reasonably calculated to influence the jury in arriving at the verdict, a new trial should be granted, notwithstanding the members of the jury testified that they were not influenced by the facts thus improperly brought before them.

■■ In this case, four of the five jurors who testified contradicted the juror Otto as to what occurred in the jury room, and expressly denied that the statements and discussion recited by him occurred in the jury room, or at any time prior to the return of the verdict. One of the jurors testified that the statements testified to by Otto occurred in the hall of the courthouse after the rendition of the verdict and discharge of the jury. The question of whether the occurrence detailed by the witness Otto occurred in the jury room and before the rendition of the verdict was a question of fact for the determination of the trial court, and it must be assumed in support of the order overruling the motion that the court found against appellants on this issue. The evidence is amply sufficient to sustain this finding.

The following cases discuss and make clear the distinction between the question here presented and the question decided in the cases cited by appellants: Sandifer v. Bank (Tex. Civ. App.) 8 S.W.(2d) 512; Day v. Ry. Co. (Tex. Civ. App.) 297 S. W. 501.

Appellants also complain of the verdict for $2,500 in favor of the minor, on the ground that the amount is an excessive compensation for the pain and suffering undergone by him as a result of his injury. The following testimony indicates the character and extent of the pain and suffering which has been caused the minor plaintiff by his injury: P. A. Adams, appellee, testified as follows on direct examination:

"When I first saw my son after the accident he was in the Heights Clinic. He was lying on the operating table at that time, in an unconscious condition. I don't know just what time he was taken to the hospital, but we took him away from the Heights Clinic about 6 o'clock in the evening and took him over to the Baptist Sanitarium, and he stayed there two days and nights, then he was taken home. I couldn't say exactly how long the boy stayed at home, but I think it was about two weeks. We had to take him to the hospital again after that. During that two weeks that he was at home he was in bed most of the time as a result of this accident. After he had been at home two weeks we then took him back to the Baptist Sanitarium, because the nerve specialist wanted to operate on him; he had to go into his spine and draw off some fluid from the base of his brain. David stayed in the hospital four days on that occasion, and then we took him back home, and as near as I can remember he was confined to his bed at home for seven days. Since that time David has been able to take very little exercise, or do any kind of work or manual labor. He has not been able to go back to school since that time.

"He could not pursue his studies because when he read or studied his music he complained of a severe headache and his eyes hurt him. We have never taken him to a picture show since he was hurt, because we were afraid it would hurt his eyes. When I saw David at the hospital after the accident he was in a great deal of pain. I would judge that David was confined to his bed altogether for about three weeks, and a good portion of that time he seemed to be in pain."

David Adams, one of the appellees, testified as follows: Direct examination:

"I can't say that I have any severe pain now, but I can't do half what I used to. I have pain in my head, and my eyes are awfully weak, I can't do any reading, and I notice I can't stand things like I used to, I am more nervous. I don't have any pain in the back of my head, it is up here and across here. My back also bothers me, I can't do much standing.

"The second time I went back there they went into my spine and drained some fluid from my brain, and they gave me some treatments while I was there. All of that hurt me a great deal.

"I do not find my violin work as easy now as it was before I was hurt; I cannot study as long; my eyes bother me when I try to practice much. It gets on my nerves.

"I am not now able to do the things I did before this accident, because I can't exert myself half like I used to. I can't study, I can't read very long without sharp pains in my head and my eyes bother me terribly. I went to a picture show once or twice; the doctor did that as a test to see about my

eyes. Looking at the picture show gave me a headache, and my eyes bother me. I didn't feel like I wanted to go to another one."

Cross-examination:

"About all I suffer with at this time is from headaches and my eyes bother me some, also my back bothers me. I cannot stand any work. My spine hurts all up and down. You see there are nerves running from your spine to every part of your body, and it makes me so nervous I just want to scream.

"It is not a fact that I am all right, outside of my eyes hurting me, my back hurting and having headaches. I am not the same boy that I was before the accident. This nervousness is part of my trouble. I cannot do what I used to, I am not right, that is all. There are lots of things I used to do that I cannot do now. I used to read books, and I can't do that now because my eyes bother me. My head aches, and I can't stand long; I can't practice long like I used to. There isn't anything hurting me right now. My back bothers me if I stand up long, or if I sit in a chair without a back, I get so nervous I don't know what to do. My head aches whenever I try to read, and if I am up late my eyes bother me in the evening."

Redirect examination: "If anybody puts on a victrola record and plays it over and over it does not bother me; music does not affect me much. If anybody does the same thing over and over it affects me. When I get nervous I feel faint, and I just want to scream. Anything that is monotonous bothers me. If I am playing the violin and I get something wrong and keep going over it again and again it makes me nervous. My life is very monotonous now without anything else to do. There is not much that I can do to amuse myself except sit around. I used to practice on my violin for as much as an hour a day. Lots of times when I had hard work to do in school if I didn't get through at night I would get up early in the morning and study. This nervousness makes me feel like I will faint, and I have to get a tight grip on myself and fight against it all the time."

█ This evidence shows that, in addition to severe physical pains which the minor had suffered, he also suffered from nervous shock and was necessarily mentally distressed. While his condition had improved, he was still suffering from his injuries at the time of the trial, which was 10 months after his injury occurred. There is no testimony indicating how long he may continue to suffer.

█ There is no rule of damages as compensation for mental and physical suffering other than the honest judgment of an intelligent, impartial jury, and unless the amount fixed by the jury is so out of proportion to the character and extent of the suffering shown by the evidence as to justify the conclusion that in fixing the amount the jury disregarded the evidence, and were influenced by prejudice, partiality, or some other improper motive, an appellate court is not authorized to disturb the verdict.

We cannot hold upon the evidence above set out that, in fixing the amount awarded the minor plaintiff, the jury were not exercising their honest judgment, uninfluenced by any improper motive, and with due regard to the evidence. Yellow Pine Paper Co. v. Lyons (Tex. Civ. App.) 159 S. W. 909; Burnett v. Anderson (Tex. Civ. App.) 207 S. W. 540; Galveston, H. & S. A. Ry. Co. v. Rodriguez (Tex. Civ. App.) 281 S. W. 259; Duncan v. Donnell (Tex. Civ. App.) 12 S.W.(2d) 811.

We have duly considered all of appellants' assignments and propositions. What we have said disposes of all the material questions presented by the brief.

It follows from the conclusions above stated that the judgment should be affirmed, and it has been so ordered.

Affirmed.