**CASSTEVENS v. TEXAS & P. RY. CO.**
No. 12270.

Court of Civil Appeals of Texas. Fort Worth.
March 1, 1930.

Rehearing Denied May 3, 1930.

Mike E. Smith, of Fort Worth, for appellant.

Samuels, Foster, Brown & McGee and J. L. Lancaster, Jr., all of Fort Worth, for appellee.

DUNKLIN, J.

While working as a car repairer in the repair shops of the Texas & Pacific Railway Company in the city of Fort Worth, Albert Casstevens undertook to remove a nut from an iron bolt by using a hammer and chisel, and, while pounding on the chisel with a hard steel hammer which weighed about one and one-half or two pounds, a small piece of steel flew off the hammer and injured one of plaintiff's fingers. After removal of his glove he extracted the sliver from his finger and continued work for some 14 days thereafter, at the termination of which period he was forced to cease work and procure medical treatment, going to a hospital for such treatment.

This suit was instituted by Casstevens against the railway company to recover damages resulting from the injury to his finger so sustained; and, from a judgment denying him a recovery, he has prosecuted this appeal.

As grounds for recovery, plaintiff alleged that the hammer with which he was working at the time of his injury was furnished to him by the defendant; that the same was unsafe by reason of its being made of defective material and having been in long use, thus rendering it brittle and liable to flake off in slivers. It was further alleged that such defects in the hammer were known to Bill Dyer and D. W. Aiken, defendant's agents and plaintiff's superiors in employment, or by the exercise of ordinary care should have been known to them, and that notwithstanding such knowledge they failed and refused to furnish to plaintiff another hammer without such defects, and that by reason of such failure the defendant was guilty of negligence, which was the proximate cause of plaintiff's injury.

In a supplemental petition and in reply to the defense of assumed risk and contributory negligence, which had been embodied in defendant's answer, plaintiff alleged that prior to his injury he discovered and reported the defective condition of the hammer to Bill Dyer and D. W. Aiken, who were his superiors in the department in which he was working and who were the defendant's agents and vice-principals, with a request that another hammer be furnished to him, and that said agents promised to comply with that request, which promise was relied on by plaintiff and in reliance thereon he continued in the employment, using the same hammer until he sustained the injury to his finger, acting under the belief that he could do so with reasonable safety to himself; that from and after the time he so notified his said superiors of the defective condition of the hammer, they had ample time to supply him with another to be used in its stead, and by reason of all of which he did not assume the risk of injury he sustained, nor was he guilty of contributory negligence in continuing to use the hammer after he had discovered its defective condition.

The trial of the case was before a jury and following the court's instructions defining "ordinary care," "negligence," "proximate cause," and "contributory negligence," the court submitted special issues, which, together with the jury's findings thereon, are as follows:

"1-A. Is the hammer produced in court by the plaintiff Casstevens a hammer which was furnished to the plaintiff in 1927 by the Texas & Pacific Railway Company? Answer: No.

"1. Did the plaintiff, prior to the time of his injury, if any, call the attention of his foreman, Bill Aikens, or assistant foreman, Bill Dyer, to the condition of the hammer he was using at that time and request them, or either of them, to furnish him with another hammer? Answer: No.

"2. If you have answered the above and foregoing question in the negative you need not answer this question, but if you have answered same in the affirmative, then answer:

"Did the said Bill Aikens and the said Bill Dyer, or either of them, promise to furnish plaintiff with another hammer? Answer: ————.

"3. Did either Mr. Aiken or Mr. Dyer know that the hammer which was in the possession of the plaintiff was in a condition dangerous for further use at the time plaintiff requested them to furnish him with another hammer, if any such request was made? Answer: No."

"7. Did the plaintiff receive an injury to the third finger of his left hand by reason of a piece of steel coming from said hammer and sticking into said finger? Answer: Yes.

"8. If you have answered question No. 2 in the negative you need not answer this question, but if you have answered same in the affirmative, then

"State whether or not the failure on the part of the defendant to furnish plaintiff with another hammer was negligence, as that term has been explained to you? Answer: ———.

"9. If you have answered question No. 8 in the negative you need not answer this question, but if you have answered same in the affirmative, then answer:

"Was such negligence the proximate cause of the injury inquired about in special issue No. 7, if you have found that such an injury was sustained, as the term negligence has been explained to you herein? Answer: ———.

"10. If you have answered special issue No. 7 in the negative you need not answer this question, but if you have answered same in the affirmative, then answer:

"Was said injury the proximate cause of the illness sustained by the plaintiff in September 1927? Answer: Yes.

"11. Are you able to state from the evidence whether the present condition of plaintiff of which he complains is the proximate result of the injury, if any, inquired about in special issue No. 7, or from disease? Answer: Yes.

"12. If you have answered the above and foregoing question in the negative you need not answer this question but if you have answered same in the affirmative, then answer:

"Was the said injury the proximate cause of plaintiff's present condition? Answer: No.

"13. Is the plaintiff's present condition the proximate result of a disease? Answer: Yes.

"14. If you have answered the above and preceding question in the negative you need not answer this question, but if you have answered same in the affirmative, then answer:

"Was such disease an intervening and independent cause of plaintiff's present condition? Answer: Yes.

"15. Are you able to state from the evidence in this case whether the injury, if any, received by plaintiff to his hand on August 17, 1927, was the proximate result of being struck by (1) a piece of steel from his hammer, or (2) a piece of steel from his cold chisel, or (3) a piece of iron from the nut, bolt, or carry-iron on which he was working? Answer: Yes.

"16. If you answer the preceding question in the negative you need not answer this question, but if you answer same in the affirmative, then answer:

"(1) Was plaintiff's hand struck by a piece of steel from his hammer on August 17, 1927? Answer: Yes.

"(2) Was plaintiff's hand struck by a piece of steel from his cold chisel on August 17, 1927? Answer: No.

"(3) Was plaintiff's hand struck by a piece of iron from the nut, bolt, or carry-iron on which he was working on August 17, 1927? Answer: No.

"17. Could the plaintiff Casstevens, under all the facts and circumstances, in the exercise of ordinary care prior to August 17, 1927, have procured another hammer? Answer: Yes.

"18. If your answer to the foregoing question be in the negative you need not answer this question, but if the same be in the affirmative, then state:

"Was the failure of plaintiff Casstevens to obtain another hammer prior to August 17, 1927, if he did so fail, negligence as that term has been hereinbefore defined to you? Answer: No.

"19. If you answer the preceding question in the negative you need not answer this question, but if you answer same in the affirmative, then answer this question:

"Was such negligence on the part of plaintiff Casstevens, if any, in failing to procure another hammer prior to August 17, 1927, the sole proximate cause of any injuries which he may have received? Answer: ———."

"21. You are instructed that by an 'unavoidable accident' is meant one which happens without fault or negligence upon the part of either party connected therewith.

"Now, bearing in mind the foregoing definition, you will answer the following question:

"Was the plaintiff's injury, if any, the result of an unavoidable accident? Answer: Yes.

"22. Was the failure of the plaintiff to obtain prompt medical treatment for such injury to plaintiff's third finger of left hand as you may find from the evidence that he received on August 17, 1927, negligence as that term has been hereinbefore defined to you? Answer: No."

"25. In what proportion do you find the amount of damages recoverable by plaintiff, if any, should be diminished on account of plaintiff's contributory negligence, if any, on the occasion in question? Answer: None.

"You are instructed in this connection that you may take into consideration in arriving at the answer to this question the acts and conduct of the plaintiff under the circumstances in question, which you may believe constituted contributory negligence on his part, if any, and that you may consider such contributory negligence, if any, on his part as to what effect it may have had toward bringing about his injury and present condition, if any, and whether his injury and present condition would have resulted, but for such contributory negligence, if any, as you may find on his part, and to what extent his injury, subsequent illness and present condition have been proximately caused and brought about by his own contributory negligence, if any.

"26. What amount of money, if any, if paid now in cash, do you find from the evidence in this case would in your judgment fairly and reasonably compensate plaintiff for the injuries, if any, sustained by him on the occasion in question? Answer: $5,000.00."

Following the last issue were instructions by the court as to what the jury might consider in determining the amount of damages to be awarded for plaintiff's injury, but those instructions are omitted since no complaint thereof has been made.

The court also gave to the jury the following instruction: "You are instructed that all of that part of plaintiff's second amended original petition which was read to you in this case which set up and sought to charge the defendant, Texas & Pacific Railway Company, with a duty to inspect the hammer in question is wholly withdrawn from your consideration and you will not take the same into consideration for any purpose."

Several other issues were submitted hypothetically, based upon the possibility of certain findings on other issues which were in fact not found, and therefore no finding was made upon the omitted issues and they will not be copied here.

In appellant's brief the following is said: "The first question to which we invite the court's attention is the failure of the trial court to submit to the jury plaintiff's case made by the pleadings and evidence and in submitting in lieu thereof plaintiff's own negligence. The same general question is involved in the following assignments of error."

That statement is followed by copies of six different assignments of error. Some of those assignments are to the effect that, by reason of the manner in which the case was submitted to the jury, plaintiff's right of recovery was made to rest upon two theories of negligence only; the first being in the furnishing to plaintiff the defective hammer with which to work, and the second in failing to supply another in its stead after plaintiff had reported to defendant's shop foreman the defective condition of the hammer furnished, and said foreman had promised to supply him with another. And appellant insists that the first four issues submitted to the jury were erroneous for that reason; and for the further reason that the same were unwarranted by plaintiff's pleadings.

It is manifest from plaintiff's pleadings and all the evidence introduced by him in support thereof that a recovery was sought under the doctrine that it is the duty of the master to exercise ordinary care to furnish the servant with tools reasonably safe for use in performing the duties of his employment. And it was expressly alleged both in plaintiff's amended original petition and supplemental petition on which he went to trial that the hammer being used by him at the time of his injury had been furnished to him for such use by the defendant's shop foreman, Aiken. That particular hammer was identified by plaintiff on the witness stand as the one which caused his injury, and was introduced in evidence and exhibited to the jury by him to prove that it was in a defective condition, and plaintiff further testified that some two weeks prior to his injury he complained to Aiken of the defective condition of the hammer, and that Aiken then promised to supply him with another free of such defects.

The exact theory of recovery thus presented was covered in the issues submitted to the jury; and that theory of recovery was also presented in the following special issues, designated as special issue E which were requested by the plaintiff and refused by the court, the refusal of which is one of the assignments of error presented here. Apparently, the refusal to submit these issues was because they were already covered by the issues that were submitted by the court.

"1. Do you find that the defendant, Texas & Pacific Railway Company furnished plaintiff, Albert Casstevens, the hammer described in plaintiff's second amended petition and introduced in evidence? Answer yes or no. Answer: ———.

"2. Do you find that said defendant, in furnishing said hammer to plaintiff, if it did so furnish same, was guilty of negligence as negligence is defined in the main charge given to you by the court? Answer Yes or No. Answer: ———.

"3. If you answer Question No. 2 last above propounded in the affirmative, then do you further find that plaintiff's injuries, if any, were the proximate result of such negligence, if any you find? Answer Yes or No. Answer: ———."

▮ Hence we are unable to perceive how it can be said that there was no basis in plaintiff's pleadings for the issues that were submitted by the court.

The plaintiff testified that the hammer was furnished to him by D. W. Aiken, the defendant's general car foreman; that before the injury he found two little places flaked off the "left side of the hammer when you hold it in front of you," and he further testified as follows: "Prior to the time when I stuck this piece into my finger, Mr. Aiken came by where I was working—way back before this accident, before I was injured with the hammer, Mr. Aiken, the General Car Foreman, came along. I was using the hammer, and a little piece chipped off. I went to him and asked him if I could get a new hammer; told him I had chipped the face, and let him take a look at it. He said, 'We haven't got any hammers in the tool room at present; I will get you another hammer and bring it to you. That hammer will do to use; go ahead.' I did not have any conversation relative to that hammer with anyone else at that time. I cannot say just exactly how long it was before this injury that I had this talk with Mr. Aikens. It was approximately two or three weeks. He did not furnish me another hammer.· I believed what he said at the time that he would give me another hammer and I relied on it. No, sir, I did not talk to anyone else before this in regard to the hammer. I talked to Mr. Aikens. Yes, I talked to Mr. Bill Dyer, assistant foreman. I told Bill Dyer the face of my hammer was chipping and that I wanted a new hammer, and he said: 'Cass, we haven't got any new hammers, but we will get you one as soon as we can get some in.' No, sir, he did not furnish me one, and I believed what he said. I relied on it. I think this was three or four days before I got hurt. I would not say for certain."

D. W. Aiken and Bill Dyer, referred to in plaintiff's testimony, each testified positively and specifically that he did not furnish the hammer to the plaintiff, and each specifically denied that the respective conversations detailed in plaintiff's testimony had ever ·occurred; and after examining the hammer introduced in evidence as the one causing his injury, each testified it was not the kind of hammer furnished by the defendant for repairing cars; that that was not a car repairer's hammer; that the car repairer's hammers which were furnished by the defendant were stamped with the letters "T. & P." and that the one exhibited had no such stamp; that he never heard of any claim by the plaintiff that he had been injured by using the hammer until after he had left the hospital. Each testified further that it was his uniform custom when a car repairer reported any defective tool, another tool in place of it was always furnished. The defendant also introduced the testimony of witnesses who had worked in the same car repairer's department who testified that it was a common occurrence for car repairers who came there for work in that department to bring with them their own tools for use in such work. That testimony, in connection with that of Aiken and Dyer, already referred to, tended to show not only that neither Aiken nor Dyer furnished plaintiff with a hammer, but on the contrary plaintiff either brought it with him when he went to work or procured it from some source other than defendant's repair shop.

Error has been assigned to the refusal of the court to submit the following issues requested by plaintiff, which is designated as special issue H:

"1. Now do you find that the hammer which was being used by the plaintiff at and prior to the time of the injury, if any, was in a defective condition? Answer yes or no. Answer: ———.

"2. If, in answer to the last foregoing question, you find that said hammer was in a defective condition at or prior to the time of the injury, then did the foreman of the car repairing department, Bill Aikens, or the assistant foreman of said defendant, Bill Dyer, know of such defective condition, if any, or would they, in the exercise of ordinary care as ordinary care is herein defined, have known of such defective condition? Answer yes or no. Answer: ———.

"3. Was the defendant, prior to the time of the injury, by and through its agents, Bill Aikens and Bill Dyer, or either of them, guilty of the failure to exercise ordinary care in respect to furnishing plaintiff with·a hammer which was reasonably safe for the performance of the duties encumbent upon the plaintiff in the discharge of his duties as a car repairer? Answer yes or no. Answer: ———."

It is insisted that those issues should have been submitted upon the theory that even though the.hammer had not been furnished to the plaintiff by the foreman or assistant foreman of the shops, nevertheless it was the duty of the defendant to exercise ordinary care to see to it that the hammer was a safe tool for work, and that if the foreman or his assistant had examined the hammer, its defects could have been discovered·prior to the injury.  .

■■ We do not believe that reversible error was committed by the refusal of the court to submit those requested issues just copied, in view of plaintiff's pleadings noted above and his testimony relied on in keeping with his pleadings and relied on for a recovery. While there were general allegations in the plaintiff's petition charging the defendant with negligence in failing to furnish a safe hammer, yet those allegations were followed by specific allegations that the hammer in question was in fact furnished by the defendant's foreman and his negligence in so furnishing was made the basis of recovery; and

there was no separate count presenting a right of recovery upon the theory if the hammer was not furnished by the defendant it was still the duty of its shop foreman to inspect the same if plaintiff procured it from some source other than the defendant's foreman or its shop for the purpose of seeing to it that it was safe for plaintiff's use. Furthermore, the requested issues now under discussion did not clearly present that alternative theory of recovery and the giving of it would have tended to confuse the jury in the consideration of the issues that were actually submitted. Moreover, the error, if any, in refusing to submit those special issues was harmless in view of the further finding of the jury that the damages sued for and allowed were not caused by the injury to plaintiff's finger in using the hammer but was the result of disease. And as noted above, plaintiff requested submission of issues upon the theory that defendant negligently furnished the hammer he used, and on which theory the case was submitted by the court.

■■ After plaintiff had introduced his evidence in chief and rested, and after the defendant had closed its evidence, plaintiff offered to prove by the witness J. E. Stepp that that witness had had a conversation with D. W. Aiken, the defendant's car foreman, after plaintiff had gone to the hospital for his injury, and in that conversation Aiken had told the witness that the plaintiff had been in the hospital and had been about to die; that plaintiff had requested him, Aiken, to take up the hammer he was using at the time of his injury and issue him another; that Aiken had promised plaintiff to do so; that Aiken did not think they had another hammer on hand at the time; that later, while plaintiff was using the hammer, a piece of steel had split off therefrom and injured plaintiff's finger and that he, Aiken, felt very bad about it and was afraid that plaintiff's people and the railway company would censure him for failing to supply plaintiff with a new hammer. Plaintiff also sought to introduce R. H. Green as a witness who would have testified that he was employed by the defendant as a car repairer before and at the time of the accident, and since the accident, and that witness knew that hammers identical with the one introduced by plaintiff in evidence were used by car foremen in the shops of the defendant at the time of the plaintiff's injury, and that he had seen such hammers so used. A proper predicate had been laid for the introduction of the testimony of Stepp by way of impeachment of the testimony of Aiken given by him as a witness for the defendant in the development of its case; and the testimony of Green was in rebuttal of testimony introduced by the defendant to the effect that the hammer was not furnished by the defendant's foreman and also to supplement plaintiff's testimony to the contrary given by him in the development of his case in chief.

It is our conclusion that the court erred in sustaining the defendant's objections to the testimony so offered on the ground that it was not admissible as rebuttal testimony. Article 2181, Rev. Civ. Statutes, 1925; Mahan v. Wolf, 61 Tex. 488; Ledbetter v. Martinez (Tex. Civ. App.) 12 S.W.(2d) 1042, and decisions there cited.

However the error, if any, in refusing to permit the introduction of the testimony so offered is harmless and will not of itself require a reversal in view of the further finding of the jury that damages sued for were not caused by the injury to plaintiff's finger in using the hammer, but were the result of disease, independently of the further finding that plaintiff's injury was the result of an unavoidable accident.

By another assignment of error it is insisted that there was no pleading or evidence to warrant the submission of issue No. 21, inquiring whether or not plaintiff's injuries were the result of an unavoidable accident and that there was no sufficient evidence to support the affirmative finding of the jury on that issue. No objection was addressed to the definition given by the court to the effect that an unavoidable accident is one which happens without fault or negligence upon the part of either party connected therewith. The proposition submitted under this assignment reads as follows: "The court is not warranted in submitting to the jury an issue when the evidence fails to present such issue."

As shown in the verdict, there was an absence of any finding of negligence of the defendant, although the issue of its negligence was submitted to be determined in the event of a prior finding that the hammer had been furnished to plaintiff by the defendant; and there was a specific finding that plaintiff was not guilty of contributory negligence. In support of that proposition, the following argument is presented: "The injury, as found by the jury, was caused by a splinter from the hammer sticking into plaintiff's finger. Had the plaintiff been supplied with a hammer free from such defects, the injury would not have occurred. The injury was not unavoidable, because by the exercise of any sort of care by the defendant and its agents they could have supplied plaintiff with a reasonably safe hammer, in which case the injury would not have occurred. If it be said that plaintiff likewise knew of the defect in the hammer, this does not aid the appellee in the contention that the injury was the result of an unavoidable accident, but in such case plainly the injury would be the result of lack of foresight and care on the part of both plaintiff and defendant, but it would not be an unavoidable accident."

■■ The argument so presented is based upon the assumption that defendant was guilty of negligence in failing to exercise ordinary care to supply plaintiff with another hammer in lieu of the one shown to be defec-

tive and from which defect the injury occurred. And in the absence of any objection to the definition given by the court of an unavoidable accident, plaintiff is in no position now to insist for the first time that even though the accident happened without fault on the part of either plaintiff or the defendant, it still could not be held to be an unavoidable accident. Furthermore, the defense of unavoidable accident was available under the defendant's general denial. G., H. & S. A. Ry. Co. v. Washington, 94 Tex. 510, 63 S. W. 534. Accordingly, this assignment is overruled.

A more difficult question is presented by another assignment to the refusal of the court to set aside the verdict and grant a new trial on account of alleged misconduct of the jury. Upon the hearing of the motion for new trial plaintiff offered John Minton, one of the jurors, as a witness to sustain the allegations of misconduct of the jury while they were deliberating upon their verdict, after the charge was submitted, and who testified as follows:

"Direct Examination.

"Mr. Mike Smith:

"I was a member of the jury that sat in the trial of the case of Albert Casstevens against the Texas & Pacific Railroad Company.

"In the first place we took a vote on the first question; and, as well as I remember, it was three or four for 'yes' and the rest of them 'no.' We argued on that quite a while, and finally the foreman made the suggestion that we would take a vote on that, and make the majority on all the questions rule—majority vote on all the questions, and they voted on that and it carried. On that particular question, as I told you, I think there were three or four (I won't say positively whether it was three or four) that voted on that one particular question 'yes' and the rest 'no'; and then they agreed finally to make the majority rule on all the questions, so that is the way they voted on all of those questions after that. They made the majority rule and voted that way.

"After we agreed to be governed by the majority, as I have testified, we then took a vote on the second issue. On that second issue the majority voted that he did not ask for a hammer. I think there were two or three votes that voted the other way. I voted with the majority. We put down 'no' to this second issue because the majority ruled, the way they agreed. The minority voted on the second issue that the plaintiff did report the condition of this hammer to Dyer or Aikens. After we had voted the foreman put down the answer. We went right on through with the whole verdict in that way. As we went down the line answering these questions the votes were divided, some voting one way and some another when the vote was put. The foreman would then write down the answer to these questions. After he took a vote, the foreman would write

the answer, and then take up another question.

"When we passed the rule that we would be governed in each question by a majority vote, at that time we had not answered completely any question in this list. We answered the first question in this way; there were two, three or four voted one way and the others voted the other way.

"When the vote was put as to our being governed by the majority, the majority voted in favor of that motion. When we voted on each question, we held up our hands, that we were in favor of so and so. That is the way we voted. When we did that, the vote was divided more or less. The foreman wrote down the answers of the majority. After we took one vote and voted in favor of answering the question according to the way the majority voted, there was then no other vote taken on that same issue. Each and every one of the questions that we did answer was answered on that same principle.

"After we had answered each and every one of these issues and got ready to come in with our verdict, there was then no other vote put to see whether the entire eleven men agreed to be bound by these answers.

"In answering question No. 21 on unavoidable accident, the same process was followed as was followed in answering the other questions.

"I can't point out this particular question on unavoidable accident and say whether I voted at all on it or not. I cannot remember all of them. I can't do that. I can't keep them all in my mind that way."

"Cross-Examination.

"By Mr. Johnson:

"We finally brought in our verdict, yes, sir, we couldn't do anything else. I think when we came out here and filed in the jury box that the court asked us whether we had reached a verdict, and that we all said 'yes.'

"When we retired to the jury room at the close of the evidence, we had some pieces of white paper to write on. There wasn't any writing done to amount to anything. The only writing that was done was on the money. I don't recall that a memorandum was kept showing how we voted on these various questions. If that was done, I don't know it. I won't say that it was or was not done. I don't know about that. The answers of the jury were finally entered on this charge that we brought back in here with us. It was signed by the foreman. I did not object to the foreman signing it. As to my agreeing to his signing it: I did not say anything to the contrary.

"Before we brought this verdict back in, after we had this preliminary method of ascertaining how the majority was, I, and all the rest of the members of the jury agreed to

those answers that were put on it there and that were then signed by the foreman and brought back out here into court."

"Redirect Examination.

"By Mr. Smith:

"We just voted once on each question. The foreman, after we had answered each and every question the way they were answered, did not then say to us, Mr. So and So do you agree to this verdict, and go on down the line to each fellow. He did not ask them in any way if that was their verdict."

"Recross-Examination.

"By Mr. Johnson:

"We agreed to that verdict that we brought in here, whereupon the following occurred:

"The Court: At this point, I think it would be proper to let the record show that when the jury came in the court asked them if they had reached a verdict and they replied that they had, and that the court read to them the questions and answers that were written and signed by the foreman and asked them if that was the verdict of each and every member of the jury, to which they nodded an assent.

"Mr. Smith: We want this record, in connection with what the court has said, to reaffirm the fact that the court could not say that each and every one nodded his head.

"The Court: No, I would not say that each and every one did, but that question was asked and some did. No dissent was made.

"The above and foregoing constituted all of the testimony introduced and heard by the Court at the hearing by the court on said motion for a new trial, and after hearing said testimony, the court overruled said motion, to which action and ruling of the court in overruling said motion upon the ground of the misconduct of the jury, plaintiff then and there in open court duly excepted, and now tenders this, his bill of exception, to said action and ruling of the court and prays that same be approved, allowed and filed as a part of the record in this cause."

In St. Louis S. W. Ry. Co. v. Ricketts, 96 Tex. 68, 70 S. W. 315. it was held by our Supreme Court that it had been the uniform rule of decision in this state that a juror would not be permitted to impeach his verdict by showing misconduct of the jury in their deliberations on the case, and that therefore affidavits of the jurors would not be received in a civil case to show such misconduct. Subsequently to the rendition of that decision the Legislature enacted what is now known as article 2234, Rev. Civ. Statutes of 1925, which reads as follows: "Where the ground of the motion is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury or that they received other testimony, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the testimony received, or the communication made, be material."

Since the enactment of that statute many decisions have been rendered in which assignments presenting misconduct of the jury as a ground for new trial have been discussed. According to all the decisions the statute vests in the trial judge considerable discretion in determining whether or not the jury has been guilty of misconduct and whether or not such misconduct, if proven, was of such character as to require the granting of a new trial. However, the following was said in International-Great N. Ry. Co. v. Cooper, 1 S.W.(2d) 578, 579, by the Commission of Appeals: "It is the settled law of this state that, 'if, upon a consideration of the whole or the pertinent record, it is reasonably doubtful whether or not the improper conduct affected the amount of the verdict or the decision of any other material issue, the verdict should be set aside by the trial judge; if, in such a case, a new trial is not granted, there is an abuse of the discretion by the trial judge, and reversal becomes the duty of appellate courts"—citing many decisions to the same effect.

If the verdict of only one juror is materially influenced by such misconduct, the judgment will be reversed. Moore v. Ivey (Tex. Com. App.) 277 S. W. 106.

But it has also been decided that the agreement of the jurors in advance to determine their verdict by a majority vote will not vitiate the verdict, if thereafter they assent to it independently of their prior agreement.

When misconduct of the jury is alleged, two issues are presented, first, whether the misconduct occurred, and the second is, if it did occur, whether the same was such as will require a reversal. The first issue is peculiarly a question of fact, and if the determination thereof by the trial judge is supported by sufficient evidence, that finding will not be disturbed on appeal, even if the truth of it is rendered doubtful by evidence to the contrary. Sandifer v. Fort Worth Nat'l Bank (Tex. Civ. App.) 8 S.W.(2d) 512 (writ of error refused).

In H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606, this is said:

"This court having refused the application for writ of error, a motion for rehearing was presented by the plaintiff in error.

"At the trial of this case, after the jury had been charged and retired, and while engaged in the consideration of the case, one or more of the jurors stated that the plaintiff ought to have a verdict for $50,000, because

the lawyers would get half. This was very reprehensible conduct, and the court might, and we believe should, have punished such juror or jurors as indulged in the urging of that suggestion. * * *

"We had doubt as to the authority of this court to review the ruling of the trial court upon the motion, so far as based upon the evidence of the jurors, and requested counsel for each party to furnish arguments to which they responded by able and helpful discussions of the question. After proper consideration given to the briefs furnished, we conclude that the 'discretion' expressed in the act above copied is upon the same level with the discretion vested in the trial judge in many instances, and that we may review its exercise wherein it clearly appears that the rights of parties have been disregarded. If the evidence taken by the trial judge left it reasonably doubtful as to the effect the statement had upon the amount of the verdict of the jury, we would feel inclined to exercise our authority and set it aside; but the judge who tried the case seems to have acted promptly and fairly in the investigation, and we know that he could form safer conclusions from examining the jurors than this court can from the record. There is much in looking at the man who testifies. * * *

"The motion for rehearing will be overruled."

According to that decision, and many others which might be cited, unless it be shown that the trial judge abused the discretion vested in him by the statutes in overruling a motion for new trial based on alleged misconduct of the jury, his action in overruling the motion for new trial based on alleged misconduct, will not be reversed on appeal.

In Kalteyer v. Mitchell, 102 Tex. 390, 117 S. W. 792, 793, 132 Am. St. Rep. 889, the Supreme Court, speaking through Chief Justice Gaines, had this to say: "In regard to the question of the misconduct of the jury: One of the jurors, upon whose testimony it was proposed to get a new trial for misconduct of the jury, swore that it was agreed to take a vote, and that, as a majority should vote, so should be their verdict; that upon taking a ballot a majority voted for the defendants; and that by reason of such ballot a verdict was rendered for the defendants. Another juror (there were but two examined) testified that when the jury retired they agreed to take a ballot, but declined to say that they agreed to be governed by the ballot; that the ballot was taken, and that they afterwards passed upon the special issues; but he again declined to say that any juror's vote was influenced by the ballot taken. The statute provides that 'if the misconduct proven, or the testimony received, or the communication made be material, a new trial may in the discretion of the court be granted.'

Laws 1905, p. 21, c. 18. We cannot say that the action of the court in refusing a new trial shows such an abuse of discretion as to authorize us to hold that it was error."

In City of Brownsville v. Crixell, 275 S. W. 430, 435, evidence was introduced on a motion for new trial which showed that some four of the jurors were induced to agree to the verdict by reason of a preliminary agreement that the vote should be returned under the majority rule. Other testimony was introduced contradicting that testimony, with the exception of one juror who, nevertheless, nodded assent to the court's question propounded to the entire jury when the verdict was returned as to whether or not that was their verdict. In holding that the judgment should not be reversed on account of alleged misconduct of the jury, the Court of Civil Appeals at San Antonio had this to say:

"Jurors are given a very broad latitude in the method they adopt in reaching their verdict. They say things that seem improper preliminarily to a final verdict. One, or maybe several of the jurymen here said they agreed to some preliminary matter such as 'it would take two-thirds majority to get these questions in form * * * so as to vote on the whole.'

"It is apparent the jury was striving honestly for a fair basis to compose their differences. There were 12 men with divergent views to be reconciled with each other before a final ballot could be had, and when that point was reached the jury was unanimous in the verdict."

An application for a writ of error in that case was dismissed by the Supreme Court for want of jurisdiction.

It will be noted that although the juror Minton testified that there was a preliminary agreement that the vote of the jury on each issue would be determined by a majority vote, and although he further testified that in the first vote taken on some of the issues, the jury was divided and later changed their vote in accordance with a preliminary agreement, yet on recross-examination, he finally testified as follows: "We agreed to that verdict that we brought in here."

And as is shown in the bill of exceptions, when the verdict was returned the court read the questions and answers to the jury and inquired whether or not that was their verdict, and each and all of the jurors nodded assent thereto, or else indicated assent by silence. And in giving his testimony on the hearing of the motion for new trial, Minton did not testify that but for the preliminary agreement in the jury room for the majority rule in answering issues, he would not, after all the issues were answered, have consented to return the verdict as it then read, and would not have given an affirmative answer to the court's question whether or not each

and all the jurors agreed to the verdict then rendered. Nor did counsel for plaintiff propound such questions to him.

Under the authorities above cited and others which might be added to a like effect, we are unable to say that the trial judge abused his discretion in overruling the motion for new trial on the ground of alleged misconduct of the jury.

For the reasons stated, the judgment of the trial court is in all things affirmed.